08 C 443

JUDGE COAR
MAGISTRATE JUDGE KEYS

# AMERICAN SERVICE INSURANCE COMPANY

## PROGRAM MANAGER AGREEMENT

## NAFTA GENERAL AGENCY



PLAINTIFF'S
EXHIBIT
A





PROGRAM MANAGER AGREEMENT – TABLE OF CONTENTS

**TOPIC**  **PAGE**

**Term of Agreement**  5

**Appointment of Manager**  5
Lines of Authority  5
Territory  5
Restrictions  5
Reinsurance Availability  5

**Manager's Duties and Responsibilities**  6
Solicitation  6
Servicing Business  6
Competent Staff  6
Premium Rates  6
Compliance with Manuals  6
Binding of Risks  6
Policy Issuance  6
Policy Cancellation  7
Sub-Producers  7
Sub-producers Errors and Omissions  7
Premiums  7
Uncollected Premium  8
Accounting  8
Fiduciary Capacity – Premium Trust Funds  9
Company Property; Confidentiality  11
Manager Expenses  12
Licenses  12
Legal Compliance  12
Governmental Contacts  12
Premium Financing  12
Company Interface  13
Copies of Policies  13
Accurate Records  13
Audit  13
Financial Statements  14
Insurance Coverages  14
Supplies  14
Prohibited Actions  14

**Claims Settlement**  15

**General Duties of Company**  16

**Representations and Warranties**  17

**Program Manager's Compensation**  18




**Advertising**   18

**Representation With Respect to Policies**   19

**Annual Standards for Volume**   19

**Insurance and Guaranty of Manager**   19
Errors and Omissions   19
General Liability   19
Surety Bond Covering Executives and Employees   19
Blanket Employee Dishonesty Bond   19
Manager's Personal Guaranty   19

**Indemnification**   20
Manager   20
Company   20

**Flat Cancellations**   20
Less than thirty (30) days   20
More than thirty (30) days   20

**Suspension of Manager's Authority**   21
Notice of Suspension   21
Legal Prohibition   21
Loss of Reinsurance   21
Loss of License   21
Indictment   21
Grounds for Immediate Termination   21
Default & Delinquency   22
Termination by Manager   22
Dispute Over Termination   22
Termination of Key Employees   22
**Commencement and Termination**   22
Basis for Termination   22
Business after Termination   24
Records Ownership Upon Termination   25

**Ownership of Expirations**   25
Use and Control   25
Failure to Pay   26
Security Interest   26
Solicitation   26

**Waiver of Statutory Termination Rights of Manager**   26

**Offset**   27

**Arbitration**   27
Submission to Arbitration   27
Notice   27



Discovery                                                          27
Arbitration Board Membership                                       28
Submission of Briefs                                              28
Arbitration Award                                                 28
Confirming Court Order                                            28
Arbitration Expense                                               28
Survival                                                          28
Procedural Law                                                    28

**Miscellaneous Terms**                                           29
Applicable Law                                                    29
Waiver                                                            29
Conflict with Law                                                 29
No Assignment                                                     29
Notices and Service of Process                                    29
Severability                                                      30
Entire Agreement; Modifications                                   30
Negotiated Agreement                                              30
Independent Contractor                                            30
Promptly                                                          30
Headings                                                          30
Honorable Undertaking                                             30
Counterparts                                                      30
Survival                                                          30

**ENDORSEMENT A** -- **Entities And Lines Of Business Governed By This Agreement**    32

**ENDORSEMENT B** -- **Classes Of Business And Authority**        33

**ENDORSEMENT C** -- **Claims Settlement (or Claims Service Agreement)**    37

**ENDORSEMENT D** -- **Commission Payments**                      44

**ENDORSEMENT E** -- **Financial Protocols**                      47

**ENDORSEMENT F** -- **Manager's Personal Guaranty**              49



## PROGRAM MANAGER AGREEMENT

This Program Manager Agreement is between NAFTA GENERAL AGENCY and all related entities as identified in the ENDORSEMENTS attached hereto and made part of this Agreement (collectively and individually: "Manager"), and American Service Insurance Company, 150 Northwest Point Blvd, Elk Grove Village, IL 60007 ("Company").

Manager and Company agree as follows:

### ARTICLE I.    Term of Agreement

This Agreement is effective on July 1, 2006 and it will continue for five years and is renewable or until terminated under the provisions under Article XV.

### ARTICLE II.    Appointment of Manager

The acts of the Manager are considered the acts of the Company on whose behalf the Manager is acting. The Manager may be examined as if the Manager were the Company. Company appoints Manager as a non-exclusive manager for the Company as follows:

A. Lines of Authority. Manager's appointment and authority extends to the classes of business, policies of insurance, including all endorsements, (the "Policies"); and lines and limits of insurance described in the ENDORSEMENTS attached to this Agreement for which Manager holds all appropriate licenses (the "Business").

B. Territory. Manager's appointment and authority extends to insureds and prospective insureds with their principal place of business or a portion of the risks located in the following jurisdictions for which it holds appropriate licenses and for which it is properly appointed by Company:

All States in the United States as set forth in the ENDORSEMENTS attached hereto and made part of this Agreement.

C. Restrictions. Manager's appointment and authority is subject to any restrictions set forth in this Agreement and in the ENDORSEMENTS attached hereto and made part of this Agreement.

D. Reinsurance Availability. Manager's appointment and authority for Business written under this Agreement is subject to the following:

1. Company is able to obtain and maintain in force at all times reinsurance satisfactory to Company for the Business. The Company's efforts in this regard will at all times be diligent and undertaken in good faith with the intent to maintain reinsurance during the term of this Agreement, however Company cannot guarantee that its efforts will be successful.

2. Obtaining reinsurance is the sole responsibility of Company. When Company obtains satisfactory reinsurance for all or some of the Business, Company will give Manager written notice that Manager may write and bind those classes of business, policies and lines and limits of insurance for which reinsurance has been obtained.

5







3. If reinsurance is terminated or no longer in full force and effect for all or any part of the Business, Manager's authority for the Business affected shall be suspended, or limited immediately upon written notice to Manager from Company, until further notice, said suspension or limitation not affecting in-force policies of insurance except with regard to renewal thereof.

## ARTICLE III. Manager's Duties and Responsibilities

Manager will faithfully perform all of its duties to the best of its professional knowledge, skill and judgment. The Manager's duties include the following:

A. Solicitation. To solicit, to the extent allowed by applicable law and regulation, risks and classes of risks at limits and for lines of insurance authorized in the ENDORSEMENTS attached hereto and made part of this Agreement, that, in their pricing and insurability, meet or exceed the underwriting and pricing standards from time to time established by Company in writing.

B. Servicing Business. To direct and implement the production, underwriting, premium collection, accounting, statistical, loss control and/or risk management services, and other work necessary or incidental to the insurance business written under this Agreement. To provide for all usual and customary services to independent sub-producers, insureds and policyholders including, without limitation, delivery of Policies, return of premiums due insureds or policyholders in Manager's possession, premium audits on Policies, and timely, appropriate responses to inquiries or complaints from sub-producers, insureds or policyholders or members of the public, and comply with any service standards as may be set forth in writing by the Company.

C. Competent Staff. To maintain sufficient supplies and equipment and a staff of competent, licensed (as necessary) and trained personnel, to produce, develop, underwrite, handle claims and loss control if allowed by endorsement and supervise the Business covered by this Agreement.

D. Premium Rates.

1. To quote and charge accurate premiums and rates for Policies bound or written under this Agreement as described in and in compliance with the approved and applicable rating manuals or written rating plans of Company provided by the Company to Manager.

2. Upon instruction from the Company or with Company's prior written approval develop, formulate and file policy forms, rates, and rules and all other reports and filings, as may be required by the regulatory authorities in the authorized states. The Manager must receive written approval from the Company before making any such filing.

E. Compliance with Manuals. To comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by Company relating to the Business covered by this Agreement.

F. Binding of Risks. To bind risks only in accordance with this Agreement and the ENDORSEMENTS attached hereto and made part of this Agreement and any other

underwriting and pricing standards from time to time established by Company in writing and provided to Manager to report all risks bound in accordance with this Agreement and the ENDORSEMENTS attached hereto and made part of this Agreement, and to forward to Company for acceptance all other risks.

G. <u>Policy Issuance.</u>  To timely and properly issue, deliver and execute or countersign Policies, certificates, endorsements, binders and related documents on forms approved by Company and appropriate regulatory authorities, as required by law, for the Business described in the ENDORSEMENTS attached hereto and made part of this Agreement. Manager shall ensure Policies bear any notice required by applicable law.

H. <u>Policy Cancellation.</u>  To cancel or non-renew policies and/or certificates for cause as set forth in such policies, or at the direction of the Company, subject to the requirements imposed by law and in compliance with the applicable provisions contained in this Agreement and the policies, and file the required reports with the appropriate Insurance Department with regard thereto.  However, this does not preclude the Company from taking such action on its own.  At the sole discretion of the Company, the Company has the right to cancel or non-renew any policy of insurance issued by the Manager under this Agreement subject to the relevant state laws, rules, regulations or bulletins.

I. <u>Sub-producers.</u>  To accept Business on behalf of Company written by properly licensed and qualified, professional insurance agents, solicitors and brokers ("sub-producers"), and to direct, supervise and coordinate the efforts of sub-producers.  Manager shall be solely responsible for payment of all commissions earned by sub-producers and return of licensed sub-producers commissions on canceled policies.  The Manager shall be responsible to Company for ensuring that it only accepts business from sub-producers who: (1) are properly licensed and appointed, (2) have agreed in advance and in writing to return unearned commissions on canceled Policies, (3) have agreed to the statutory waiver contained in Article XVII of this Agreement, (4) forward all premium funds owed in a manner consistent with the terms of this agreement, and (5) otherwise comply with all applicable laws and regulations involving business generated or serviced under this agreement.  Manager is not authorized to appoint agents for Company or to place such volume of business with any sub-producer that would cause such sub-producer to qualify as a "managing general agent" with respect to the Company under the insurance laws of any jurisdiction.  Manager shall not accept business on behalf of Company from any sub-producer that has been convicted of any criminal felony involving dishonesty or a breach of trust, or convicted of a crime under 18 U.S. Code Section 1033

J. <u>Sub-producers Errors and Omissions.</u>  Manager will maintain valid evidence of any U.S. sub-producers' professional errors and omissions coverage (a policy copy or certificate of insurance) that specifically covers all activities and entities contemplated herein, to specifically include coverage for violations of Unfair Trade Practices Acts and Bad Faith, in an amount not less than $1,000,000, with a deductible not greater than $10,000.

K. <u>Premiums.</u>  To charge, collect, receive and receipt for all premiums, including but not limited to premium surcharges, fire district and other taxes or assessments levied by any jurisdiction and required to be collected in addition to stated premiums, due on all Policies bound or written under this Agreement, and deposit such amounts in the Premium Account (as hereinafter defined) in accordance with Article III.N and pay Company in accordance with Article III.M.



L. Uncollected Premium. To assume the obligation for any Uncollected Premium to insureds, policyholders and sub-producers, and to be fully responsible for the full amount of the premium due Company on Policies written or bound under this Agreement as follows:

1. Manager shall remain responsible for uncollectible amounts due the Company that are equal to or greater than $10/policy.

2. Company shall accept responsibility for uncollectible amounts due the Company, which are under $10/policy subject to a maximum exposure equal to 0.25% of earned premium.

3. Manager shall provide Company with a monthly policy-level listing of all policies with uncollectible amounts due the Company in a format acceptable to the Company.

4. Manager shall provide the Company with monthly aging reports in a format acceptable to the Company.

M. Accounting. To timely account for the Business as follows:

1. Establish and maintain true, accurate and complete books, records and accounts of all transactions arising under this Agreement in the manner and as required by the Company, in accordance with statutory accounting principles and insurance practices, and the insurance laws and regulations of Illinois, in state(s) where the Business is located and Manager's state of domicile. The Company shall have access to and the right to copy all such books, records and accounts at any time and all such books, records, and accounts shall be the sole property of the Company. Upon an order of liquidation of the insurer, the Manager shall have reasonable access to and the right to copy the files on a timely basis.

2. Collect, compile and timely transmit to the Company for the timely transmission to the appropriate reporting agencies any and all of the requested statistical, underwriting and claims data and information, including but not limited to, premium and loss information in a format or formats and at such frequency as may be determined by the respective reporting agency and Company. This data and information shall be furnished to the Company in an electronically transmittable format determined by the Company at no extra charge to the Company. The Company may assume the duties of reporting statistical data at its discretion. The Manager agrees that it will pay the Company $1,000 for each time the Manager does not comply with statistical filings deadlines.

3. Furnish, render and provide the Company with an accounting detailing all transactions and insurance written pursuant to this Agreement, including but not limited to all Policies and/or certificates issued (by policy/certificate), changes and cancellations and premium statements on not less than a monthly basis and not later than four(4) working days after the end of the month in which the transaction occurs and/or the premium is written. This information shall be furnished to the Company in an electronically transmittable format determined by the Company at no extra charge to the Company beginning at the end of the month in which this Agreement becomes effective.

8



The Account shall include for each authorized line of insurance, the following, and such additional information as Company may request in writing:

(a.) Gross written premium;
(b.) Net written premium;
(c.) Collected premium;
(d.) Gross fees;
(e.) Collected fees;
(f.) Policies issued or bound by insured including location, limits, and effective date;
(g.) Policies canceled;
(h.) Premium adjustments due to endorsements, audits or otherwise;
(i.) Commissions payable to or retained by Manager;
(j.) Net balance due;
(k.) Premium surcharges, fire district and other taxes or assessments levied by any jurisdiction;
(l.) Deposits by policy;
(m.)        Agency fees.

4.  Manager shall provide the Company with monthly aging reports of premiums receivable, at policy level, in a format acceptable to the Company.

5.  Manager shall provide the Company a monthly reconciliation of checks issued through the claims zero balance account to the paid amounts included in the monthly reporting template.

6.  The Manager shall pay Company balances due including deposits (escrow fund) within four (4) days of the end of each calendar month for which the bordereau is transmitted.

7.  All accounts, records and remittances shall be in U.S. dollars.

8.  Except as set forth in paragraph L of Article III, Manager shall be responsible to pay balances due the Company regardless of whether the premium, fees or assessments are collected from the policyholder, broker, agent or sub-producer.

9.  The omission from any statement or bordereau of any item due the Company shall in no way modify or otherwise affect the responsibility of Manager to account for and pay the Company any and all premiums, net of commission, or any other monies due Company, nor shall the omissions prejudice the right of the Company to collect any and all sums to which it is entitled.

N.  Fiduciary Capacity – Premium Trust Funds.  To act as fiduciary for the Company and comply with the following:

1.  All premiums, policy fees, revenues generated by servicing fees received relating to the Business written under this Agreement are the property of the Company and are received by Manager on behalf of the Company and shall be deposited as they are received by the Manager into a premium trust account established and maintained by the Company as set forth in subsection 2 below.



2. The <u>Manager</u> shall establish and maintain a Premium Account entitled "American Service – Premium Trust Account" (hereinafter "ASIPTA") at:

   First National Bank
   25 East Price Road
   Brownsville, TX 78520

   The above bank and any successor bank approved by Company shall always be a member of the Federal Reserve System whose deposits are insured by the Federal Deposit Insurance Corporation. The Company's approval of this bank, or successor bank, shall not be unreasonably withheld.

3. The Manager shall not commingle any premium or other funds relating to the business written under this agreement with its other corporate accounts, or other funds held in any other capacity.

4. The Company shall maintain signature authority on said Premium Account. ASIPTA.

5. The Manager shall deposit all funds owed to Company into the ASIPTA on a daily basis.

6. The Company shall grant the Manager authority to issue checks from Premium Trust Fund Account(ASIPTA).

   (a.) To return unearned premiums arising from cancellations or endorsements of Company's policies,
   (b.) To issue checks for monies deposited in error, and
   (c.) To pay commission owed to Sub-Producers.

   The Manager may not issue checks for more than five thousand dollars ($5,000) in any one transaction or a maximum of one million dollars ($1,000,000) from the ASIPTA for any calendar month covered under this Agreement. Manager will not issue checks totaling more than the funds then available in the ASIPTA. Manager shall send the bank a 'positive pay file' of checks issued and voided from the ASIPTA as checks are issued. .

7. The Company shall grant the Manager authority to issue checks through a claims zero balance account (hereinafter "C–ZBA") strictly for the purpose of making claims payments in accordance with the provisions outlined under Endorsement C. Manager shall send the bank a 'positive pay file' of checks issued and voided from the C-ZBA as checks are issued or made. Manager will not issue checks totaling more than the funds then available in the C-ZBA.

8. Manager shall provide the Company a monthly reconciliation of check items processed through the C-ZBA to the loss reporting template and a monthly reconciliation of collected premium to the amount deposited in the ASIPTA. Such report shall be provided in an electronically transmittable format acceptable to the Company.

9. Not Applicable




9. Not Applicable

10. The Manager shall be due any interest accrued on monies which will be held in the American Service Insurance Premium Trust Account (ASIPTA), based on the projected average daily balance in the ASIPTA. Company will sweep the monies due the Company upon reconciliation of the monthly bordereaux in accordance with Article III, Manager's Duties and Responsibilities, Paragraph M.3 Accounting.

11. The Manager shall refund commissions owed to Company, including those paid to its Manager and to its Sub-producers, on policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

12. Manager shall provide the Company a monthly reconciliation of Manager withdrawals.

13. The Manager shall not offset any balances due under this Agreement with any amount due under any other agreement between the Company and the Manager The Company shall pay Manager the compensation due Manager, if any, as defined in Endorsement D, within 3 business days of Manager's submission of the bordereau and the monthly reconciliation of withdrawals to the Company.

14. The Manager shall refund commissions on policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

15. The Manager's duties and obligations pursuant to this Agreement shall be fully and unconditionally guaranteed pursuant to guarantees by Manager as covered under Endorsement F of this Agreement.

16. If Manager fails to pay Company any premiums or monies when due, or fails to comply with applicable premium fund trust laws and regulations, such failure shall constitute a breach of and default under this Agreement.

17. All monies or funds received by Manager on behalf of Company under this Agreement are deemed received by Manager in a fiduciary capacity inclusive of any amount withdrawn by Manager from the ASIPTA. Manager shall not withhold any monies or property of that Company that is not expressly authorized.

O. Company Property; Confidentiality. To promote and safeguard at all times as a fiduciary the best interests and good name of Company and to safeguard, maintain and account for all Policies, forms, manuals, equipment, supplies or anything else furnished by Company or Manager, all of which shall remain the property of Company. Manager will return all such property to Company promptly upon demand. The materials or information furnished to Manager may contain proprietary or confidential information of Company (collectively "Confidential Information"). Manager agrees not to directly or indirectly use or disclose such Confidential Information to any other parties without the express written permission of Company. Manager shall use the same care and discretion to protect the Confidential Information as Manager uses to protect its own Confidential Information, but not less than a reasonable and diligent standard of care. Manager shall use the Confidential Information and shall restrict disclosure of the Confidential

11



Confidential Information disclosed only for purposes strictly limited to the performance of Manager's duties under this Agreement. Manager agrees to indemnify and hold Company harmless from and against any and all damages, liability, losses, attorney's fees, costs, causes of action and claims of whatsoever kind or nature related in any way to the violation by Manager, or any employee, agent, sub-producer, person or entity who has received Confidential Information from Manager, of any of the provisions of this sub-paragraph

*[handwritten in right margin: Attorney fees for breach of Confident.]*

P.  <u>Manager Expenses.</u>  To pay, to assume the obligation for and to be fully responsible for all costs and expenses associated with the Manager's performance under this Agreement including: processing of assigned risk policies, sub-producer commissions, loss control reports, premium audits, regulatory exams and related fees, fines and settlement costs, policy and policy jacket printing, motor vehicle reports ("MVR's") and OFAC costs, travel expense, employee salaries, benefits, fees, countersignature fees and expense, postage, advertising, exchanges, and license fees. Company shall be responsible only for its own costs and expenses unless otherwise agreed by Company. In the event Company is required to pay any costs or expenses that are the responsibility of the Manager, the Manager shall promptly reimburse Company for its payments and shall after 30 days from invoice pay to Company interest accruing at a rate of 10% per annum on such payments. The Company shall have the right to offset any costs or expenses that it has to pay on behalf of Manager with commissions due under this Agreement.
The Manager shall refund the commissions on policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained or paid.

Q.  <u>Licenses.</u>  To obtain and provide Company with copies of all licenses and permits required by Manager for the proper conduct of its duties under this Agreement and to immediately provide copies of such licenses and permits upon request of the Company. Manager agrees that it will not transact any business in any jurisdiction covered under this Agreement until Manager has obtained all required licenses and permits, and is properly appointed to represent the Company in such jurisdiction.

R.  <u>Legal Compliance.</u>  To keep fully informed of and comply fully with all applicable laws and regulations. This includes, but is not limited to compliance with all laws and regulations applicable to insurance producers in the state(s) where the Business is located. Manager shall not solicit or bind any risks in any state until all applicable laws, regulations and ISO/NCCI or other bureau rules have been complied with.

S.  <u>Governmental Contacts.</u>  To promptly notify Company of all contacts and correspondence received from insurance regulatory or other governmental authorities relating to the insurance and activities which are the subject of this Agreement, to forward promptly upon receipt all summonses, complaints, subpoenas or other court documents relating to the insurance and activities which are the subject of this Agreement, and to cooperate fully with Company in making any responses. Manager has no authority to represent Company in regulatory matters and shall not respond to any governmental action except as Company may direct in writing or as required by law. All complaints from regulatory agencies shall be forwarded to the Attention of the Compliance Department in the Company's Elk Grove Village, Illinois Office along with the appropriate response specifically addressing the complaint.

T.  <u>Premium Financing.</u>  If Policies are premium financed, to use premium financing through

unaffiliated licensed premium finance companies on policies issued under this Agreement. Manager shall remit one hundred (100%) percent of the financed premium to Company, and in no event shall Manager hold any such financed premiums longer than allowed by Paragraph N. above. Manager shall provide all services related to premium financing, including, but not limited to, promptly and appropriately responding to all correspondence and notices related to such premium financing, and ensuring compliance with all Consumer Protection law, rules or regulations (such as Truth in Lending) and any relevant Premium Finance statutes in each state where the Manager writes business pursuant to this Agreement as appropriate. Manager shall ensure that all applicable refunds of premium due to premium finance companies shall be made, and Manager shall be liable for, hold harmless, and indemnify Company against any such amounts improperly paid to the insured, or for refunds not made to the insured or to the premium finance company in accordance with the appropriate governing law.

U.  <u>Company Interface.</u>  To interface at all times with Company through electronic data processing hardware and software, networks and communication lines and other means as specified in writing and in advance by Company.

V.  <u>Copies of Policies</u>  To maintain in each insured's file all Policies, endorsements, rating worksheets and related documents and correspondence, Policy cancellations and other terminations processed by the Manager.

W.  <u>Accurate Records</u>  To keep and maintain for a period of ten (10) years from the termination of this Agreement, separate, identifiable, orderly, accurate, complete and timely records and accounts of all business and transactions pertaining to Policies bound or written under this Agreement including complete underwriting and rate files. Such records and files shall be the property of Company, however, a copy of said records and files may at all times be maintained by Manager. Upon request by Company or the insurance regulator or Commissioner of any state having jurisdiction over Company ("Commissioner"), all records and reports maintained pursuant to this Article III., shall be provided as hard copies or in an electronic/computer format usable by Company and the Commissioner.

X.  <u>Audit.</u>  To permit Company or designated representatives, during the term of this Agreement and for a period of ten (10) years from the termination of this Agreement, to visit, inspect, examine, audit and verify, at Manager's offices or elsewhere, during Manager's normal business hours and as often as Company may deem appropriate but in no event less than eight times annually, with ten (10) business days prior notice, any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers, internal controls and other records belonging to or in the possession or control of Manager or of any other person relating to the Business covered by this Agreement. The Manager may also be required to submit to an independent financial examination in a format acceptable to regulatory authorities. The form of the financial examination will be specified by the Company and may include, but is not limited to, an audit opinion of the external financial statements, specific accounts and/or internal controls. The results and all related materials will at all times be maintained by Company in the strictest confidence and only used by Company as it relates to the writing of Business under this Agreement. Company may make copies and extracts as may be reasonably necessary. Company may conduct any audit through any person or persons it may designate and the Insurance Department of any state having jurisdiction over this Agreement shall have the right to exercise Company's rights of audit under this Section after consultation with the

13




Company and the Manager agrees it may be examined as if it were the Company. Manager agrees to respond to any audit deficiencies within thirty (30) days after notice from the company.

Y.  Financial Statements.

1.  To furnish the Company with an unaudited financial statement for the most current year ended December 31, no later than ninety (90) days after the execution hereof, or the Company may, at its option, render this Agreement void ab initio. Thereafter, the Manager shall furnish the Company, on an annual basis, an unaudited financial statement prepared by an independent certified public accountant, as of December 31 of each calendar year, in a form acceptable to the Company, no later than March 31 of each year. In addition, quarterly estimates will be supplied to the Company by the Manager and an audited financial statement shall be submitted to company every three years. The Company shall rely on all financial statements provided by Manager in commencing and continuing the relationship established by this agreement.

2.  To furnish the Company with actuarial reports by an outside, nationally recognized, independent actuarial firm agreeable to the Company of accident year loss and loss adjustment expense reserves by state and line of business for all business written under this Agreement no later than forty-five (45) days after the end of each year.

3.  The Manager agrees that it will pay Company $1,000 for each day the above statements and/or reports are not received by the Company.

Z.  Insurance Coverages.  To maintain in force the insurance coverages specified under Article XI and to immediately notify Company in the event of cancellation, non-renewal or if fifty percent (50%) of the indicated limits have been exhausted, in which case the Company, may at its option, deem the Manager in breach of and in default of this Agreement.

AA.    Supplies.  To return all supplies furnished to Manager by the Company to the Company or its representative promptly upon demand. The materials or information furnished to Manager may contain proprietary or confidential information of Company. Manager agrees not to disclose such proprietary or confidential information to any other parties without the express written permission of Company.

BB. Prohibited Actions.  The Manager shall have no authority to:

1.  Bind any reinsurance or retro-cessions, including, but not limited to, facultative or treaty, on behalf of Company, or commit Company to participate in insurance or reinsurance syndicates. This responsibility shall remain with the Company.

2.  Appoint any producer or sub-producer that is not lawfully licensed to transact the insurance business for which it has been appointed;

3.  Collect any payment from a reinsurer or commit the Company to any claim settlement with a reinsurer.

4.  Jointly employ an individual who is employed with Company;

14




5. Appoint a sub-Manager or Program Administrator;

6. Extend any binding authority to sub-producers, nor provide to sub-producers any evidence or indicia of such authority with exception of non resident private passenger automobile and non resident commercial automobile daily certificates.

7. The Manager shall not pay or commit the Company to pay a claim over the amounts specified in Endorsement C, or as the Company may from time to time promulgate, net of reinsurance, which amount shall not exceed one percent (1%) of the Company's policyholder's surplus; or $25,000, whichever is greater, as of December 31 of the last completed calendar year.

## ARTICLE IV. Claims Settlement

Manager's authority, if any, to adjust, compromise, settle, defend, or pay any claim made on the Policies written or bound under this Agreement is set forth in the ENDORSEMENTS attached hereto and made part of this Agreement. All claim files shall be the joint property of the Company and Manager. However, upon an order of liquidation or administrative suspension of the Company, the claims and related application files shall become sole property of the Company or its estate. The Manager shall have reasonable access to and the right to copy the files on a timely basis. Further, the Manager shall:

A. Give immediate notice upon receiving notice or knowledge of any claim or loss to Company of all claims, suits and losses and to cooperate fully with Company to facilitate the investigation, adjustment, defense, settlement and payment of each and all claims, and assign such claim or loss for handling as may be directed in writing by Company.

B. Assure that all claims are adjusted by properly licensed persons, as required by applicable state law.

C. Assist Company in the collection of deductibles due, salvage and subrogation.

D. Give immediate notice to Company of any claim or suit brought against Company where Company or any of its affiliated companies is named as defendant relating to the Business governed by this Agreement, and Company shall assume sole and full control of the defense of that claim or suit.

E. The Manager will not be reimbursed by Company for the salaries, office expenses or any other expenses incurred in the handling of claims unless otherwise expressly agreed to in writing by Company.

F. The Manager shall send the Company a copy of the claims file anytime at the Company's request and shall send the Company immediate written notice as soon as it becomes known that the claim

1. Has the potential to exceed an amount determined by the Insurance Commissioner of the state where the risk is located or exceeds any limit which the Company may from time to time set;

2. Involves a coverage dispute or bad faith allegations;

15



3. May exceed the Manager's claims settlement authority as outlined in Endorsement C;

4. Is open for more than 6 (six) months;

5. Is closed by payment of an amount set by the Insurance Commissioner of the state where the risk is located or by an amount which the Company may from time to time set, whichever is less.

G. Any claims settlement authority granted to Manager pursuant to Endorsement C may be terminated by the Company for cause, or at the Company's sole discretion upon written notice to the Manager or upon the termination of this Agreement. The Company may suspend the Manager's settlement authority during the pendency of any dispute or arbitration proceeding regarding the cause for termination.

## ARTICLE V.  General Duties of Company

The Company shall:

A. Make all statistical filings and receive all statistical and underwriting data applying to the Program written pursuant to this Agreement, provided that the Manager furnishes all required information and data in a timely manner so as to enable the Company to meet all time requirements.

B. Develop, formulate and file policy forms, rates and rules and all other reports and filings, as may be required by the regulatory authorities in the various states where business under this agreement is to be conducted.

C. Allow to the Manager the commissions and fees to which it is entitled upon Manager's monthly rendering of the reports due under this Agreement to the Company, beginning at the end of the month in which this Agreement becomes effective.

D. Conduct, at least semi-annually and as often as Company deems prudent, solely at Company's discretion, upon reasonable notice and during normal working hours, an on-site audit of the books, records and accounts of the Manager, including but not limited to those in the underwriting, claims, accounting, IT, marketing, finance and policyholder operations, using either its own employees or independent outside auditors.

E. Observe and comply with all applicable laws, regulations and rulings by any governmental authority, agency, bureau or commission having jurisdiction over the conduct of business under this Agreement.

F. The company shall have the right to: (i) cancel or non-renew any policy of insurance subject to applicable laws and regulations concerning those actions; and (ii) require cancellation of any subproducer's contract after appropriate notice.

G. If Manager qualifies as a "managing general agent" of Company under any applicable state statute, Company shall not permit any of Manager's sub-producers to serve on Company's Board of Directors; nor shall the Company appoint to its board of directors an officer, director, employee, sub-producer or controlling shareholder of Manager unless otherwise permitted by law.

16




**ARTICLE VI. Representations and Warranties**

A.  Company warrants and represents that the transactions contemplated hereby:

  1.  are within the corporate powers of the Company;

  2.  have been duly authorized by all necessary corporate action of the Company;

  3.  constitute the legal, valid and binding obligations of the Company, enforceable against it in accordance with their terms; and

  4.  do not and will not conflict with, result in a breach in any of the provisions of, or constitute a default under the provisions of any law, regulation, licensing requirement, charter provision, by-law or other instrument applicable to the Company or its employees or to which the company is a party or may be bound.

B.  Manager warrants and represents that the transactions contemplated hereby:

  1.  are within the corporate powers of the Manager;

  2.  have been duly authorized by all necessary corporate action of the Manager; and Manager is duly authorized to execute this Agreement on behalf of, and to bind, all entities identified as Manager hereunder.

  3.  constitute the legal, valid and binding obligations of the Manager, enforceable against it in accordance with their terms; and

  4.  do not and will not conflict with, result in a breach in any of the provisions of, or constitute a default under the provisions of any law, regulation, licensing requirement, charter provision, by-law or other instrument applicable to the Manager or its employees or to which the Manager is a part or may be bound.

C.  Manager warrants and represents that it currently holds all necessary licenses as an agent or producer, and if necessary, a managing general agent, in all states in which this Agreement will apply to lawfully carry out its duties and obligations under this Agreement.  Manager further warrants and represents that neither Manager, its principals, nor any of its employees has been convicted of any criminal felony involving dishonesty or a breach of trust, or convicted of a crime under 18 U.S. Code Section 1033 and gives Company the authority to verify same. Manager hereby gives Company the right to verify information about Manager, its officers, directors or other principals by obtaining and using consumer reports, investigative reports, credit reports, D&B reports, criminal background checks or any other similar type of report or check. Company warrants that such reports or checks will be obtained strictly for business purposes to verify Manager's eligibility or continued eligibility, financially and otherwise, to be a party hereto.

D.  Manager warrants and represents that:

  1.  it has the proper right and interest in the business contemplated herein in order to place the business under this Agreement;




2. the business being placed under this Agreement is not subject to another entity's claim of interest, including but not limited to a claim by contract or common law right; and

3. in placing business under this Agreement, it is not in violation of any duty or obligation owed to another entity.

4. in the event Manager breaches any of the preceding terms, Manager agrees to indemnify and hold harmless the Company pursuant to Article XII from any loss or expense arising out of such breach.

E. Manager warrants and represents that it presently has in effect all insurance policies as required under the provisions of Article XI.

F. Manager warrants and represents that the software it employs is designed to fulfill all necessary obligations under this Agreement.

G. Manager warrants and represents that the underwriting guidelines to be used by it with regard to the Program are now and will continue for the life of this Agreement to be in conformity with the applicable statutes, regulations, rules, bulletins and opinions in the various states where business under this agreement is to be conducted.

**ARTICLE VII.        Program Manager's Compensation**

Company will pay the Manager as full compensation for all of its duties and responsibilities under this Agreement as stipulated in the ENDORSEMENTS attached hereto and made part of this Agreement.–Manager shall have right to collect and retain fees, other than those fees specifically provided for in the Company's rate filing, in a manner consistent with any and all applicable State Statutes and Regulations. However, such fees shall be disclosed to the Company in the manner provided for in Article III, M, 3. (m).

**ARTICLE VIII.        Advertising**

Manager will not refer to Company (or any division or affiliate of Company) or use the Company's logo, or that of its parent company, in any advertisement, letter, circular, pamphlet or other publication or statement without the prior written consent of Company. Company will not be responsible, under any circumstances, for any advertising expense. Manager will insure that any reference to Company pursuant to this Article shall comply with the laws and regulations of the jurisdiction in which such advertising occurs or to which it is directed.

**ARTICLE IX. Representation With Respect to Policies**

Manager will not make or permit independent sub-producers or any other person to make any representation to applicants, insureds, policyholders or claimants as to the existence or extent of coverage either available from Company or under a Policy that is not consistent with the terms and conditions of coverages available from Company or of a Policy. Manager shall establish procedures designed to ensure that Manager and Manager's employees, **agents, and sub-producers** will make known to any applicant, insured or policyholder the full scope and effect of all exclusions and limitations upon or under coverage provided under the Policy and advise independent sub-producers of their existing statutory obligations and Manager's and

18




Company's expectations in this regard.

## ARTICLE X.  Annual Standards for Volume

Manager will comply with any annual maximum and minimum standards of production for premium volume that are made a part of the ENDORSEMENTS attached hereto and made part of this Agreement.

## ARTICLE XI. Insurance and Guaranty of Manager

Manager will maintain from the inception of this Agreement until all run off business resulting from this Agreement terminates with unaffiliated insurers and on forms acceptable to the Company:

A.  <u>Errors and Omissions.</u>  Professional errors and omissions policy that specifically covers all activities and entities contemplated herein, to specifically include coverage for violations of Unfair Trade Practices Acts and Bad Faith, in an amount not less than $5,000,000, with a deductible not greater than $100,000.  The errors and omissions policy shall list the Company as an additional named insured.

B.  <u>General Liability.</u>  Comprehensive general liability or umbrella liability insurance policy in an amount of $1,000,000 per occurrence.  The General Liability policy shall list Company as an additional named insured.

C.  <u>Surety Bond Covering Executives and Employees.</u> The Manager must provide a surety bond for the benefit of the Company in an amount equal to $1 Million: ($100,000 or 5%,GDWP whichever is greater, of the expected gross direct written premium underwritten by the Manager on behalf of the Company in any calendar year covered by this agreement.  The bond shall provide for a discovery period and prior notification of cancellation in accordance with state-specific regulations).

D.  <u>Blanket employee dishonesty bond.</u>  Covering all employees of Manager in an amount of $300,000.

E.  <u>Manager's Personal Guaranty.</u>  At the sole discretion of the Company, an appropriate officer of the Manager, as well as an appropriate officer of all affiliated entities identified in Endorsement A, shall be required to sign and execute, concurrently with the execution of the Agreement, a **Personal** Guaranty to encourage the Manager's prompt and faithful compliance with any and all payment obligations under this Agreement, to include the Manager's responsibility to comply with Premium Finance statutes in making refunds to insureds or to policyholders.  The Company reserves the right to require spousal signatures on the **Personal** Guaranty in addition to the signatures of the Manager's officers at Company's sole discretion.  The Company may also require the Manager to post a form of security acceptable to the Company, in an amount to be determined at the sole discretion of the Company, in order to securitize the **Personal** Guaranty.  The Personal Guaranty may be found at Endorsement F to the Agreement.

Company shall require certificates of insurance or other evidence that the insurance and other forms of security required by this Article is and remains in force.  Manager shall provide such certificates of insurance or other proof on at least an annual basis, or as otherwise directed by the Company.

19



**ARTICLE XII.        Indemnification**

A. <u>Manager.</u>  Manager shall be responsible to Company and shall indemnify, save, defend and hold Company, (or its rehabilitator or liquidator) including its affiliates, and all officers, directors and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including, without limitation attorneys' fees caused by or resulting from any allegation of any negligence, misconduct, error, omission or other act; or breach of this Agreement by Manager, Manager's employees, Third Party Administrator, Adjuster, or any other type of independent contractor employed or retained by Manager or Manager's affiliates unless the conduct giving rise to the allegation was performed at the specific direction of Company.

B. <u>Company.</u>  Company shall be responsible to Manager and shall indemnify, save, defend and hold Manager, including its affiliates, and all shareholders, officers, directors and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorneys' fees caused by or resulting from any allegation of any misconduct, error, omission, or other act or breach of this Agreement by Company, provided Manager has not contributed to or compounded the act alleged.

**ARTICLE XIII.        Flat Cancellations**

A. <u>Less than thirty (30) days.</u>  If a Policy is canceled flat, the originals of the canceled Policy or a lost policy release shall be retained by Manager in the insured's file.  Manager will cancel flat a Policy only if it has been in effect for less than thirty (30) days, or if no coverage has attached, and then only if the following conditions are confirmed by the Company:

   1.  no regulatory filings have been made; and

   2.  no facultative reinsurance commitments or expenses have been incurred by the Company; and

   3.  no other miscellaneous expenditures have been incurred by the Company (i.e., loss control reports, etc.).

   4.  no claims paid.

B. <u>More than thirty (30) days.</u>  An appropriate premium charge established by Company and provided in writing to Manager shall be made for any Policy in force for a period in excess of thirty (30) days or if no coverage has attached.

**ARTICLE XIV.        Suspension of Manager's Authority**

A. <u>Notice of Suspension.</u>  The Company may suspend the authority of the Manager to bind the Company only for the reasons and in accordance with the procedures described below.  The Company shall give immediate written notice of the suspension of authority and the Manager shall then immediately cease to exercise its authority until the reason for the suspension is resolved.  Once resolved, the Company shall immediately reinstate the




authority of the Manager. Notwithstanding any action taken pursuant to this Section, the parties may exercise whatever rights they may have to terminate this Agreement.

B. <u>Legal Prohibition.</u> The Company may suspend binding authority for the Program if the Company is legally prohibited from writing insurance for the Program. In such event, the suspension shall remain in effect until the prohibition has been lifted. The suspension shall only apply to the jurisdiction in which the Company is unable to continue writing business.

C. <u>Loss of Reinsurance.</u> The Company may suspend binding authority, if in its sole discretion there has occurred any of the following:

    1. impairment of the reinsurance coverage with respect to the Program business;

    2. reduction in A.M. Best's rating of any reinsurer;

    3. cancellation or suspension of the reinsurance with respect to all or any material portion of the Program business;

    4. the failure of a reinsurer to discharge obligations under all or any portion of any reinsurance contract relating to business subject to this Agreement;

    5. the ceasing of any reinsurer to carry on the particular classes of business subject to this Agreement or having the performance of such reinsurance rendered illegal by any subsequent law or regulation;

    6. insolvency of a reinsurer reinsuring all or a material part of the Business; or

    7. any instance where a reinsurer suspends payment of debts, convenes a meeting of creditors, has a receiver appointed or petition presented for its compulsory liquidation, or has a resolution passed for its voluntary liquidation.

The Manager agrees that upon notification from the Company, it shall immediately cease the binding of any Policies under this Agreement.

D. <u>Loss of License.</u> The Company may suspend binding authority if a regulatory authority cancels, restricts, suspends or declines to renew either the Company's or the Manager's license or certificate of authority, provided said license or certificate of authority is required to solicit and bind Business pursuant to the terms of this Agreement. In such event, the suspension shall remain in effect until such license or certificate of authority has been granted or reinstated by the regulatory authority and satisfactory evidence of such action has been provided to all parties.

E. <u>Indictment.</u> The Company may suspend binding authority if the Manager or any of the Manager's executive officers is indicted for a criminal offense the conviction of which would permit termination of the Manager under this Agreement.

F. <u>Grounds for Immediate Termination.</u> The Company may suspend binding authority for any reason that would permit termination of the Manager under this Agreement under Article XV.A.4.

21



G. <u>Default and Delinquency.</u> The Company may suspend binding authority for failure of the Manager to perform its duties and responsibilities under this Agreement including without limitation, the timely remitting of accounts and monies to Company, insureds or policyholders and timely and full compliance with applicable laws and regulations and Company directives, rules, regulations or manuals.

H. <u>Termination by Manager.</u> The Company may suspend binding authority if the Manager gives notice of termination under Article XV.A.2.

I. <u>Dispute Over Termination.</u> The Company may suspend binding authority in the event of a dispute over the reason for termination of the Agreement.

J. <u>Termination of Key Employees</u>. The Company may suspend the binding authority if the employment of the individuals identified in Endorsement B is terminated.

## ARTICLE XV. Commencement and Termination

This Agreement shall commence as of the date of execution of both parties and shall remain in full force until terminated in accordance with the provisions outlined below.

A. <u>Basis for Termination.</u>

1. This Agreement may be terminated at any time upon the mutual written agreement of the Company and the Manager.

2. This Agreement may be terminated at any time by either party upon ninety (90) days prior written notice to the other party.

3. This Agreement may be terminated at any time by the Company, upon thirty (30) days written notice to Manager in the event of:

   (a.) <u>Excessive Complaints.</u> The number of complaints received by the Company relating to the Manager's performance and service to insureds, policyholders, sub-producers or members of the public is excessive, as may be determined by the Company in its sole discretion, or in the event of regulatory notice to the Company regarding the number of complaints relating to the business.

   (b.) <u>Adverse Legislation.</u> Enactment of legislation which in the opinion of the Company would adversely affect the Company's rights under this Agreement or liabilities under the Policies;

   (c.) <u>Conflict of Law.</u> As provided for in Article XX.C;

   (d.) <u>Default.</u> The failure of the Manager to perform its duties and responsibilities under this Agreement including, without limitation, the timely remittance of accounts and monies to the Company, insureds or policyholders and timely and full compliance with applicable laws and regulations and the Company's directives, rules, regulations or manuals;

   (e.) <u>Insufficient or Inaccurate Data.</u> The failure of the Manager to properly compute and report all required account data as required by Article III.M.




(f.) Ownership Change. A change in the ownership or management of or in the event of the execution of an agreement of sale, transfer or merger of the Manager without prior notice and consent of the Company.

4. This Agreement may be terminated immediately at any time by either party by written notice:

(a.) Act of bankruptcy. If the other party commits any act of bankruptcy, becomes insolvent or assigns all or part of its assets for the benefit of creditors upon or after the filing of a petition for bankruptcy, whether voluntary or involuntary.

(b.) Misconduct. In the event of fraud, abandonment, gross or willful misconduct, material breach of contract, insolvency, or lack of legal capacity to act, including cancellation, suspension or non-renewal of its license or certificate of authority, on the part of either party. Gross or willful misconduct shall include, but shall not be limited to:

(i.) failure to pay any funds owing to the other party for any reason within ten (10) days after the time set forth in this Agreement other than as provided above regarding minor accounting differences;

(ii.) the delegation of any of Manager's obligations and/or assignment of any rights hereunder without the written consent of the Company; or

(iii.) either party being delinquent two (2) times in any consecutive twelve (12) month period in either the accounting for or the payment of any and all monies due the other party for any reason.

(c.) Constructive termination. If the Manager cancels or non-renews fifty percent (50%) or more of the business written pursuant to this Agreement in order to, directly or indirectly, place the business with a carrier other than the Company, other than as a result of being instructed to take such action by the Company and except if such action is taken following either party's issuance of a notice of intent to terminate this Agreement.

(d.) Legal. If the Company determines that any law or regulation of a federal, state or local government has rendered performance of any material terms of this Agreement illegal, but only insofar as this Agreement applies to such jurisdiction.

(e.) Loss ratio. If the Losses Incurred (as defined in Endorsement D) develop to 105% or more of the premium earned for any accident year.

(f.) Material breach. If Manager is in material breach of Agreement (and such breach is not cured within the time specified below for cure) and provided the party seeking to terminate this Agreement has given the other party thirty (30) days prior written notice of the nature of the claimed breach and its intent to terminate if the claimed breach is not cured within such thirty (30) days period.

(g.) Loss of insurance. If Manager loses, does not renew, or does not have any of their insurance coverages cited in Article XI.

23



B. <u>Business After Termination.</u>  In the event of termination of this Agreement, at the election of the Manager, the Company shall continue Policies and binders in force until their stated expiration dates, subject to the following provisions:

1. The Company reserves all its rights to cancel Policies and binders for nonpayment of premium and to cancel Policies and binders issued in violation of the Program's underwriting guidelines then applicable provided said cancellation comports with applicable state law.

2. The Manager shall continue to be the agent of the Company for the purpose of servicing Policies and binders in force on or before the date of termination of this Agreement. The Manager shall not, without prior written approval of the Company, increase or extend the Company's liability or extend the term or change any conditions of any such Policies under the Program.  Upon termination, the Manager shall cease to have any authority to solicit, underwrite, bind or issue business to be insured by the Company under the Program.

3. Upon termination of the Agreement, the Company shall have no obligation to pay the Manager for services in settlement of accounts or concluding of affairs between the Company and the Manager.

4. If this Agreement is terminated as provided for herein, neither party shall have any claim against the other for loss of prospective profits or fees or damage to business arising solely as a result of said termination.

5. In the event of termination of the Agreement, any business written hereunder and remaining with the Company shall be permitted to continue to normal expiration, provided, however, that if the renewal date of any annual policy shall occur within a period of thirty (30) days after the date of termination of the Agreement, and such renewal shall have had renewal terms already committed, such policy shall be renewed and permitted to continue in force until its next annual renewal date.

6. Should any Policy be extended, continued or renewed due to regulatory or other legal restrictions, the terms of this Agreement shall continue to apply to such policies until such Policies are terminated or expire.

7. Regardless of any dispute, the Company and Manager will fulfill any obligations on policies.

8. <u>Claims after termination.</u>

   (a.) The Company will have the right to determine who will handle claim servicing in the event of termination.  This may include reinsurance and/or loss portfolio transfer arrangements.

   (b.) In the event this agreement terminates and the Manager refuses or is unable to administer servicing of business produced under this agreement, then in that event the Manager shall immediately provide the Company with on-line access to all records necessary to administer business produced hereunder.

24




(c.) Manager hereby grants, at no cost to the Company, a limited license to the Company to use the Manager's software in connection with the administration and run-off of the business produced hereunder.

(d.) In the event the Company takes over the servicing of claims business, the Company shall immediately cease paying the Claims Service Fee described in Endorsement C, Article IV.

(e.) In the event the Manager is unable to support (b) above, then the Manager shall immediately provide the Company with a tape back-up of all programs and data libraries, including updated source code, object code, data files, and all related manuals used in the production and administration of business hereunder (the "Data"). The company agrees that it shall utilize the Data solely for the purpose of administering the business produced hereunder.

(f.) The Manager agrees to provide for an orderly and timely transition of claim files and support documents to ASI. This will be done prior to the termination date, unless immediate termination was used in which case it will be done within 10 days of the termination date.

C.  Records Ownership Upon Termination. Except as otherwise provided herein, in the event of termination of this Agreement and provided the Manager has, in accordance with the terms of this Agreement, accounted for and paid to the Company all premiums and other monies due and owing the Company (other than minor accounting and payment disputes addressed above), all Program records together with the use, control and ownership of such records, including but not limited to all expirations and loss information (collectively "Program Records") which shall be provided to Company no less than monthly or upon written request and for a period of ten (10) years following policy termination in a mutually agreeable electronic format, except as proved herein, shall remain the sole property of the Manager, even if there exists a good faith dispute between the parties with respect to minor issues related to accounting and/or payment of premiums or other monies claimed to be due and owing.  Notwithstanding the foregoing, if this Agreement is terminated by Company pursuant to subparagraphs XV A(3)(a), (d) or (e) or XV A(4)(b) or (f), all Program Records shall be the sole property of the Company and the Manager shall immediately deliver to the Company all such Program Records and data storage systems containing the information set forth in the Program Records in a format usable by the Company. Upon termination of this Agreement for any reason the Manager agrees:

1.  to return to the Company any and all materials belonging to the Company, and

2.  to immediately discontinue the dissemination or use of any materials, marketing or otherwise, bearing the Company's name or logo.

**ARTICLE XVI.     Ownership of Expirations**

A.  Use and control. The use and control of, and all right, title and interest in, all expirations, and all records pertaining to insurance written pursuant to this Agreement shall remain Manager's property and remain in Manager's undisputed possession, provided that Manager remains solvent, does not commit an act of bankruptcy, and has paid and Manager continues to pay to Company on a timely basis any and all premiums or other

25




monies due Company in accordance with this Agreement, excluding any minor accounting disputes and any good faith dispute between the parties with respect to minor issues regarding the accounting and/or payment of premiums claimed to be due and owing. Notwithstanding the foregoing, if this Agreement is terminated by the Company pursuant to subparagraphs XV A(3)(a), (d) or (e) or XV A(4)(b) or (f), the use and control of all expirations, and all records pertaining to insurance written pursuant to this Agreement, shall be transferred to and immediately become the property of the Company. In such event, Manager shall execute all documents and take all other action reasonably necessary to transfer ownership, use and control of all expirations, and all records pertaining to insurance written pursuant to this Agreement, to the Company and otherwise cooperate with the Company in connection therewith. Company may, in its discretion, sell at a private or public sale such expirations and records and any amount realized shall be retained by Company free and clear of any claim, lien or encumbrance of Manager.

B. <u>Failure to pay</u>. In the event the Manager fails to pay to Company on a timely basis any and all premiums or other monies due to Company in accordance with this Agreement (other than as noted above relating to good faith disputes and minor accounting and payment disputes), the use and control of, and all right, title and interest in and to the records thereof, all expirations, applicable to insurance which was written pursuant to this Agreement, shall be vested in Company. Company may, in its discretion, sell at private or public sale such expirations and records, and if Company does not realize sufficient money from such sale to discharge Manager's indebtedness to Company, Manager shall remain liable for the balance of the amount owed to Company. Any amount realized by Company in excess of Manager's indebtedness to Company, after deduction of all costs and expenses of selling such expirations and records, shall be retained by Manager.

C. <u>Security Interest</u>. To secure all indebtedness or liabilities for which Manager and/or its affiliated entities as set forth in Endorsement A are now, or may become liable to the Company in any manner pursuant to this Agreement, the Manager and its affiliated entities specified in Endorsement A grant to the Company, and its present and future affiliates, a security interest in all inventory, chattel paper, accounts, equipment, general intangibles and fixtures, including, but not limited to, all expirations and all records, commissions, and after acquired collateral relating to insurance policies written by Manager and/or its affiliated entities (per Endorsement A), and all products and proceeds from the foregoing. The Manager, and/or its affiliated entities listed in Endorsement A will sign any papers the Company considers necessary to obtain, maintain and perfect this security interest or to comply with applicable law.

D. <u>Solicitation</u>. Except as provided for in Paragraph B. of this Article, unless authorized by Manager in writing, Company shall not use Manager's records to identify policyholders whose expirations Manager owns and for whom Company writes insurance, in order to solicit said policyholders for any lines of insurance, products or services. In the event that the expirations shall be owned by the Company, as provided in Article XVI, Manager shall not use any of the records to identify policyholders whose expirations are owned by the Company and for whom the Company provides insurance in order to solicit said policyholders for any lines of insurance, products or services.

**ARTICLE XVII.**     **Waiver of Statutory Termination Rights of Manager**

Both Manager and Company are aware that there are or may be laws or regulations that may

26




be interpreted to provide Manager with certain rights of notice, "run-off", continuation of business written through Manager, prevention of termination and regulatory review and possible disapproval of the termination of this Agreement. Because this Agreement has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon Manager both beyond those and different from those of a normal soliciting agent, Manager acknowledges that this necessitates a different relationship. Manager therefore specifically waives any and all rights with respect to termination of this Agreement that may now or hereafter be provided Manager by statute or regulation in recognition of that different relationship, and shall not impose upon or require compliance by Company of any obligations relating to termination of this Agreement other than those provided for specifically in this agreement.

**ARTICLE XVIII.        Offset**

All amounts due Manager or Company under this or any other agreement between the parties shall be subject to the right of offset, whether or not subject entities are presently listed in this Agreement. For the protection of the Company, the Company shall have the right of offset with respect to any premium not timely refunded to premium finance companies or to insureds in the time allotted by the appropriate state law, or within 30 days after policy cancellation, whichever is greater so long as the premium in question arises from business generated pursuant to this Agreement. For the purposes of this Article, Manager shall include all subsidiaries and affiliates. The Manager may not use the right of offset to remove funds the Manager believes it is owed from the Premium Account without the prior written consent of the Company.

**ARTICLE XIX.        Arbitration**

A. <u>Submission to Arbitration.</u> In the event of any dispute between the Company and the Manager with reference to the interpretation, application, formation, enforcement or validity of this Agreement, or their rights with respect to any transaction involved, whether such dispute arises before or after termination of this Agreement, such dispute, upon written request of either party, shall be submitted to the decision of a board of arbitration composed of two arbitrators and an umpire meeting at the Company's offices unless otherwise mutually agreed. Notwithstanding the generality of the foregoing, the Company's right to exercise any of the options or rights contained in Article III.N, Article XIV and Article XV or to obtain any other legally available injunctive remedies shall not be limited by the submission of any dispute to arbitration. The board of arbitration will have complete jurisdiction over the entire matter in dispute, including any question as to its arbitrability.

B. <u>Notice.</u> The notice requesting arbitration shall state in particulars all principal issues to be resolved, name the requesting party's arbitrator and shall set a date for the hearing, which date shall be no sooner than 90 days and no later than 120 days from the date that the notice requesting arbitration is mailed.

C. <u>Discovery.</u> Each party may obtain discovery from the other through written interrogatories and through requests for documentation, and may depose witnesses upon notice to the other. Any objections to production of documents or to the scope of discovery shall be submitted to the umpire for resolution. The umpire may schedule a conference at which the parties may present oral arguments and submit written briefs with respect to the production of documents or the scope of discovery. The umpire shall




render a decision within two business days of the conference. The decision shall be binding on the parties.

D. <u>Arbitration Board Membership.</u> The members of the board of arbitration shall be active or retired and disinterested officials of insurance companies or lawyers. Each party shall appoint its own arbitrator and the two arbitrators shall choose a third arbitrator as umpire before the date set for the hearing. The umpire shall be a lawyer. If the party receiving the notice of arbitration fails to appoint its arbitrator within thirty (30) days after having received the written notice of arbitration, the party giving notice shall appoint the second arbitrator. If the two arbitrators fail to agree upon the appointment of the umpire within thirty (30) days after their appointments, each of them shall name three, of whom the other shall decline two and the selection of the umpire from the remaining two nominees shall be made by drawing lots. The umpire shall promptly notify all parties to the arbitration of his selection.

E. <u>Submission of Briefs.</u> The parties shall submit their initial briefs within twenty (20) days from appointment of the umpire. Each may submit reply briefs within ten (10) days after filing the initial briefs.

F. <u>Arbitration Award.</u> The board shall make an award with regard to the custom and usage of the insurance business which shall be in writing and shall state the factual and legal basis for the award. The board may award compensatory money damages and interest thereupon but may not award punitive, exemplary or similar damages arising out of or in connection with a breach of this Agreement. The award shall be based upon a hearing in which evidence may be introduced without following strict rules of evidence but in which cross-examination and rebuttal shall be allowed. At its own election or at the request of the board, either party may submit a post-hearing brief for consideration of the board within twenty (20) days of the close of the hearing. The board shall make its award within thirty (30) days following the close of the hearing or the submission of post-hearing briefs, whichever is later, unless the parties consent to an extension. A decision by the majority of the members of the board shall become the award of the board and shall be final and binding upon all parties to the proceeding.

G. <u>Confirming Court Order.</u> Either party may apply to the United States District Court for the Northern District of Illinois, sitting at 7th Circuit or to the Circuit Court of Cook County, Illinois for an order confirming the award or to enforce any decision by the umpire with respect to discovery. The parties consent to the jurisdiction of any such court. A judgment of such Court shall thereupon be entered. If such an order is issued, the attorney's fees of the party so applying and court costs will be paid by the party against whom confirmation is sought.

H. <u>Arbitration Expense.</u> Each party shall bear the expense of its own arbitrator and shall jointly and equally bear with the other party the expense of the umpire. The remaining costs of the arbitration proceedings or any other costs relating to the arbitration may be allocated by the board.

I. <u>Survival.</u> This Article shall survive the termination of this Agreement.

J. <u>Procedural Law.</u> The Uniform Arbitration Act, 710 ILCS5, et seq., shall govern the conduct of arbitrations pursuant to this Agreement.

28



**ARTICLE XX.Miscellaneous Terms**

A. <u>Applicable Law.</u>  The rights of the parties to this Agreement shall be governed by and construed in accordance with the law(s) of the State of Illinois without regard to Illinois rules on conflict of laws.

B. <u>Waiver.</u>  The failure of the Company or Manager to insist on strict compliance with this Agreement, or to exercise any right or remedy shall not constitute a waiver of any rights provided under this Agreement, or stop the parties from thereafter demanding full and complete compliance or prevent the parties from exercising such a remedy in the future.

C. <u>Conflict with Law.</u>  If any provision of this Agreement should be declared invalid by a court of general jurisdiction and superseded by specific law or regulation, such law or regulation shall control to the extent of such conflict without affecting the remaining provisions of this Agreement.  However, if the Company believes that the voiding of any provision hereof materially affects the whole Agreement or the relationship of the parties under this Agreement, the Company by notice may terminate this Agreement by giving thirty (30) days notice to the other.

D. <u>No Assignment.</u>  Neither this Agreement nor any rights or obligations under this Agreement may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other party.

E. <u>Notices and Service of Process.</u>  Any notices given with regard to this Agreement (other than the Company's notices or invoices with respect to amounts due hereunder) shall be sent to the following addresses by U.S. mail or any other means calculated to provide notice:

   1. To Company:

      American Service Insurance Company
      150 Northwest Point Boulevard
      Fifth Floor
      Elk Grove Village,
      IL 60007
      Attn:  Thomas R. Ossmann

   2. To Manager:

      NAFTA GENERAL AGENCY
      Personal & Confidential
      Attn:  Ramon Villareal

F. The parties hereby consent to the exclusive jurisdiction of either the Circuit Court of Cook County, Illinois or the United States District Court for the Northern District of Illinois, sitting at 7th Circuit regarding any disputes relating to or arising out of this Agreement.  For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U. S. mail or overnight courier/delivery service to the addresses specified above.



G. <u>Severability.</u> If any provision hereof is or shall at any time be deemed invalid and unenforceable then, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect and shall be liberally construed in favor of the Company in order to carry out the intentions of the parties hereto subject to subsection XV. A. 4. (d) as nearly as may be possible.

H. <u>Entire Agreement; Modifications.</u> This Agreement constitutes the entire agreement of the parties with respect to the subject matter herein and supersedes any other previous agreements or quotations, whether written or oral, between the Company and the Manager, unless specifically referred to within this Agreement. Except where otherwise provided by the terms of this Agreement, this Agreement may not be released, discharged, amended or modified except in writing signed by both parties. Notwithstanding the foregoing, manuals, rules, regulations, guidelines, instructions and directions issued in writing by the Company from time to time as provided in this Agreement, shall bind the Manager as though a part of this Agreement.

I. <u>Negotiated Agreement.</u> This Agreement has been negotiated by the parties and the fact that the initial and final draft shall have been prepared by Company shall not be used in any forum in the construction or interpretation of this Agreement or any of its provisions.

J. <u>Independent Contractor.</u> This Agreement is not a contract of employment and nothing contained in this Agreement shall be construed to create the relationship of joint venture, partnership, or employer and employee between Company and Manager or between Manager and any independent producers. Manager is an independent contractor and shall be free, subject to the terms and conditions of this Agreement, to exercise judgment and discretion with regard to the conduct of business.

K. <u>Promptly.</u> Unless the context and circumstances require action sooner, the term "promptly" in this Agreement shall be defined to mean "within five (5) business days".

L. <u>Headings.</u> The headings preceding the text of the articles and paragraphs of this Agreement are intended and inserted solely for the convenience of reference and shall not affect the meaning, construction or effect of this Agreement.

M. <u>Honorable Undertaking.</u> This Agreement shall be considered an honorable undertaking made in good faith and shall be subject to a liberal construction for the purpose of giving effect to the good faith and honorable intentions of Manager and Company.

N. <u>Counterparts.</u> This Agreement may be executed in duplicate counterparts and via facsimile with an original signature to follow promptly via U.S. Mail, each of which shall be deemed an original but both of which when taken together shall be deemed one and the same document.

O. <u>Survival.</u> Articles XII, XIV, XV B, XVI and XIX shall survive the termination of this Agreement.



IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:                                          Company:

NAFTA GENERAL AGENCY                              American Service Insurance Company

By: _____                       By: _Thomas R. Inman_____

Title: _Pres._____                      Title: _President & CEO_____

Date: _30 / Jun / 06_____                       Date: _July 5 2006_____

WITNESS: _____                        WITNESS: _____


By: _____

Title: _DIRECTOR OF OPERATIONS_

Date: _6/29/06_____

WITNESS: _____

31

**ENDORSEMENT A**
**PROGRAM MANAGER AGREEMENT**
**ENTITIES AND LINES OF BUSINESS GOVERNED BY THIS CONTRACT**

**ARTICLE I.   Entities and lines of business.**  This Endorsement identifies those entities under common ownership or control that are authorized to conduct business under this Agreement. Company may apply termination and other relevant provisions of this Agreement to one entity, line of business, or territory without necessarily affecting other subject entities, lines of business or territories.   If there are multiple contingent commission endorsements applicable to the various entities or lines of business operating under this agreement, the amounts calculated hereunder shall be combined across all entities and lines to produce a single amount payable for each year that nets all losses and loss-carry-forwards from any entity or line against profit from other entities or lines.

| Entity (name, address, etc.) | Lines of Business | Effective Date | Governing Endorsements |
|---|---|---|---|
| NAFTA GEN. AGNCY. | NON RESIDENT PRIV. PASS. AUTO | JULY 1, 2006 | A,B,C,D,E,F |
| | NON RESIDENT COMM'L AUTO | JULY 1, 2006 | A,B,C,D,E,F |



32

**ENDORSEMENT B**
**PROGRAM MANAGER AGREEMENT**
**CLASSES OF BUSINESS AND AUTHORITY**

**ARTICLE I. Classes of business.** Manager's authority and responsibility extends to the following classes of business, policies of insurance (including endorsements), lines of business and limits of insurance. Wherever reference is made to ASI Standard Underwriting Guidelines, please note that it is Manager's responsibility to access and base relevant decisions on Company's most current (on-line) version of ASI Standard Underwriting Guidelines.

    A. Authorized classes of business. Manager's authority includes only the following classes of business:

        1. Non Resident Private Passenger and Non Resident Commercial Automobile.

    B. Prohibited classes of business. Manager has no authority for all types of business cited as "prohibited" or "risks not written" in ASI Standard Underwriting Guidelines with the following exceptions and additions:

        1. EXCEPTIONS (i.e., Manager's authority is further broadened to include these items):

            (a.) None.

        2. ADDITIONS (i.e., Manager's authority is further restricted to require referral to Company for these items):

            (a.) None.

    C. Referral classes of business. Manager shall refer to the Company for prior approval for all types of Non Resident Commercial Automobile business cited as "submit" or "conditionally acceptable" in ASI Standard Underwriting Guidelines with the following exceptions and additions:

        1. EXCEPTIONS (i.e., Manager's authority is further broadened to include these items):

            (a.) None.

        2. ADDITIONS (i.e., Manager's authority is further restricted to exclude these items):

            (a.) Any risk with more than 15 power units
            (b.) Any risk for which Manager utilizes a schedule credit in excess of 10%.
            (c.) Any risk having an auto outside of Managers' territory, as detailed below.
            (d.) Any risk having an average of 150,000 or more miles per power unit per year.
            (e.) Any risk with a calculated loss ratio of 50% or more aggregated for all prior policy periods or for a single policy period.



D. Maximum Allowed Policy Coverages / Limits ("N/A" denotes not authorized)

1. Non Resident Commercial Automobile Liability : $1,000,000 Combined Single Limit.
2. Non Resident Private Passenger Auto Liability : $100,000 Bodily Injury per person/$200,000 Bodily Injury per accident/$100,000 Property Damage per accident.
3. Non Resident Private Passenger Medical Payments: $2,500 per person/$10,000 per accident.

E. Maximum Annual Premium Volume shall be $8,000,000 Non Resident Commercial Auto and $7,000,000 Non Resident Private Passenger.

**ARTICLE II. Authority to Bind Commercial Term and Fleet Risks.** Manager's authority to bind qualifying accounts is specified below.

A. The first 25 term accounts to be quoted must be submitted to the Company for approval prior to release of binding authority.

B. To the extent the first 25 submissions are satisfactory to the Company, binding authority for qualifying accounts will be authorized.

C. Once authorized (as above), your binding authority is limited to accounts with less than or equal to 15 power units.

D. To quote/bind a risk in excess of 15 power units the following information must be submitted to the Company for prior approval before the effective date of coverage:

1. Application
2. Loss Runs/Summary
3. Safer Report
4. Rating Information and worksheet
5. Driver Summary and Vehicle Summary including age and weight of vehicles.

E. Binding authority is extended solely to:

1. Danny Hernandez
2. Lupita Pelanche
3. Manager's other underwriters as delegated with an underwriting authority letter signed by Mr. Hernandez.

**ARTICLE III. Territory.**    Manager's authority and responsibility extends to qualifying accounts headquartered only in the following territories.

A. Mexico

B. Additional states to be added at the written consent of Company.

C. All other Risks outside these territories require prior written Company approval.

D. Company reserves the right to modify the list of approved territories at its sole discretion.

34



**ARTICLE IV. Underwriting Information.**

A. Prior to quoting any qualifying account, Manager must obtain at least the requisite underwriting information cited in the ASI Standard Underwriting Guidelines with the following exceptions and additions:

   1. EXCEPTIONS (i.e., Manager need not secure the following information prior to quoting an authorized account):

      (a.) None.

   2. ADDITIONS (i.e., Manager must secure the following information prior to quoting an authorized account):

      (a.) None.

B. At the minimum, Manager will obtain the following information prior to binding any qualifying account:

   1. Completed and Signed Applications, including any Supplemental Applications.
   2. Vehicle VIN numbers and values

**ARTICLE V.   Renewal Processing**

A. Renewal processing must begin no less than thirty(30) days prior to expiration of policy.

B. Not applicable.

C. For those accounts facing an increase on renewal and with the intent to renew, a letter must be mailed within the time mandated by the state indicating that an increase in premium may occur.

D. Renewal quote must be issued and released to the insured within the state mandated guidelines.

**ARTICLE VI. Policy Processing and Reports to Company.**

A. Policy Processing:   Manager shall adhere to the following standards for issuing, endorsing and/or canceling policies issued in accordance with this Agreement:

   1. All policies will be issued for a maximum term of 12 months using approved forms, as provided by the Company, within thirty (30) days of the policy effective date.
   2. Endorsements to policies issued by Manager will be processed within 30 days of the effective date of the endorsement.
   3. Cancellations of policies will conform to Cancellation Standards as defined by the Company.



B.  Additional Responsibilities of Manager

1.  Manager will comply with all written terms and conditions of Company's "General Rules" provided to Manager by the Company whether expressed in this Endorsement or not.

2.  Manager will maintain all correspondence necessary to underwrite, rate and manage risks subject to this Agreement and shall make risk files available to Company for its review at any time.

3.  Account files will contain at least the following information:

    (a.) All items listed in Article IV ("Underwriting Information") above.
    (b.) Full copy of policy
    (c.) All correspondence
    (d.) Billing information
    (e.) Safer Report
    (f.) Loss runs
    (g.) Application
    (h.) Rating worksheet
    (i.) California Employer Pull Notice Program form.

4.  Manager is knowledgeable of and agrees to be fully responsible for compliance with all applicable national security and privacy laws and regulations. This includes, but is not limited to, the Office of Foreign Assets Control requirements, the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Insurance Information and Privacy Protection Act and those regulations promulgated to support implementation thereof. The Manager shall make all compliance measures and documents available to the Company.

36



**ENDORSEMENT C**
**CLAIMS SERVICE AGREEMENT**
**TO**
**PROGRAM MANAGER AGREEMENT**

**ARTICLE I.    Duties of the Manager.**  The Manager shall provide the following claim management services to the Company:

A.  Investigate liability, damages and coverages, evaluate, negotiate claims through settlement or final disposition, and issue all claim payments with funds provided by the Company.  All payments will be documented and supported, with frequent reconciliation by traditional accounting methods.

B.  Prepare and file all reports and handle all claims in accordance with established claims procedures and state guidelines, assuring compliance with *Fair Claims Practice Acts,* and all other applicable statutes and regulations.

C.  Maintain a separate file on each claim with appropriate physical documentation and within an electronic information management system, to track activities, file notes and to manage all reserve and payment activity, which file shall be the joint property of Company and Manager.  However upon an order of liquidation of Company such files shall become the sole property of the insurer or its estate.  Monthly management reports shall be provided per terms agreed to by both parties.  Furthermore, the Manager will provide the Company access to their electronic claims information management system via a computer located in the Company's Home Office.

D.  Coordinate, direct and manage litigation activity, assigning defense to house counsel and to outside legal counsel selected from an outside counsel list with any changes to the list subject to Company's review and approval.  Notwithstanding any other provision of this Agreement, Company will have ultimate control of all legal decisions and retains right to handle and direct any litigation at any time.

E.  Establish initial reserves and adjust them according to the instructions provided in Article III of this Endorsement.

F.  Coordinate all outside field assignments, investigations, appraisals and experts, based on need, cost-effectiveness and return on expense/cost.  Company must give prior approval before the Manager hires any independent adjusters, experts or consultants.

G.  Manage, direct and coordinate claim file and operational audits, reinspections of direct repair facilities, and regular evaluation of cost containment and other cost control measures.

H.  Coordinate and handle all subrogation and salvage disposal activities based on applicable state title statutes and regulations, applying recoveries and tracking transactions.

I.  Conduct four (4) management random audits per year, with results submitted to the Company in writing.

J.  Other than those that are to be handled pursuant to Article III, Q of this Agreement, address all complaints from regulatory or other governmental entities, maintaining a log recording them, including whether such is justified, the resolution and steps taken to address the issues.

K.  Allow Company to perform periodic audits of claim files being handled by Manager on behalf of Company. Manager will cooperate fully with Company and allow complete access to Company's claim files and to Manager's claim system. Audits will be on-site at any of Manager's claim offices and will be at sole discretion of Company.

L.  Directly handle and manage all claim and legal activity and not subcontract any services covered under this Agreement without the express written approval of Company.

M.  Handle Company's claims consistent with the Manager's established practices and procedures. In the event of any conflict between the Manager's established practices and procedures and this Agreement, the terms, conditions and provisions of this Agreement shall govern.

N.  If and when applicable, evaluate all members of its direct repair facility network for quality and compliance with any applicable state or industry guidelines, regulations or statutes which Manager warrants and represents that it has done. Manager further warrants and represents that it has contracts with all members of any direct repair facility network insuring that the facility has adequate liability insurance and are independent contractors exercising independent judgment in the repair of damaged motor vehicles.

O.  Company shall be liable for any extra-contractual obligations, including, but not limited to punitive, exemplary or compensatory damages arising out of the handling of any claims on business covered hereunder, such liabilities arising because of, but limited to, the following: failure by the Manager to settle within the policy limit or by reason of alleged negligence in (i) rejecting an offer of settlement, or (ii) in the preparation of the defense, or (iii) in the trial of any action against its insured or reinsured, or (iv) in the preparation or prosecution of an appeal consequent upon such action, except for those extra-contractual obligations which arise due to Manager's gross or willful misconduct, negligence or failure to exercise professional claims business practices, including but not limited to acts or omissions of Manager giving rise to allegations against Company for bad faith.

P.  In the event that Company decides to handle a claim(s), cooperate fully with Company to facilitate the investigation, adjustment, settlement and payment of each and all claims, and assign such claim or loss for handling as may be directed in writing by Company.

Q.  Give immediate notice to Company of any claim (other than PIP claims) or suit brought against Company where Company or any of its affiliated companies is named as defendant, and Company reserves the right to assume sole and full control of the defense of that claim or suit.

R.  The Manager will not be reimbursed by Company for the salaries, office expenses or any other expenses incurred in the handling of claims unless otherwise expressly agreed to in writing by Company.

38




S. The Manager shall send the Company a copy of the claims file anytime at the Company's request and as soon as it becomes known that the claim

    1. Has the potential to exceed an amount determined by the Insurance Commissioner of the state where the risk is located or exceeds any limit which the Company may from time to time set;

    2. May exceed the Manager's claims settlement authority as outlined in this Endorsement, Article II. D herein;

    3. Involves a coverage dispute;

    4. Is open for more than six months;

    4. Is closed by payment of an amount set by the Insurance Commissioner of the state where the risk is located or by an amount which the Company may from time to time set, whichever is less.

A. The Manager shall give immediate notice to the company of any claim involving one or more of the following elements:
   - Written allegations of bad faith
   - Claims seeking coverage in excess of the policy limits
   - All claims involving suspected fraud
   - Reserves over $25,000.00 US
   - All files involving fatality or catastrophic injuries such as brain injury, spinal cord injury, amputations, scarring, fractures and other major injuries
   - All losses requiring reporting to reinsurers

**ARTICLE II.    Duties of the Company.** The Company agrees to the following as respects Manager's claim management services.

A. Honor the payment of all covered loss payments and claim service fees issued by the Manager. The Company is solely responsible for funding and maintaining adequate funds in the C-ZBA. Manager may not retain more than three months estimated claims payments and allocated loss adjustment expense in the C-ZBA, which amount shall be agreed to by the Company and Manager.

B. The Manager must supply positive pay file to Company for the C-ZBA as the checks are issued.

C. Provide up-to-date information on any changes in excess insurance, limits of coverage, self-insured retention, or any changes that may affect its capacity to fulfill financial obligations to the Manager or as required to the public. (This includes up-to-date status of any regulatory actions, formal or informal, pending against Company.)

D. Cooperate fully in the disposition of the claims, including but not limited to, providing Manager with $20,000.00 settlement authority per claim.

E. Provide Manager with 30 days advance written notice for any potential changes which might impact Manager's financial capacity to deliver proper service, handle claims




promptly and to honor agreed settlements with any party to a loss, vendors or providers within the limits of the policy.

**ARTICLE III.    Reserving Procedures.** Evaluation of the exposure is critical and ongoing. Each claim must be evaluated on the basis of the most current and credible information beginning at the time of the initial report of loss and continuing through all phases of handling until the file is closed. Delays mean understated losses and improper rates as well as missed settlement opportunities. The following discussion outlines American Service Insurance Company's evaluation and reserving policy. Of course, no written policy can cover every situation that might arise, it is expected that your claim professionals will use common sense and good claim judgment.

A. <u>Initial Factor reserves.</u> A prompt and appropriate value is necessary on every claim file to properly reserve our liabilities. The Manager shall use the following initial factor reserves on all open claims:

| Personal Auto | | Commercial Auto | |
|---|---|---|---|
| 1. BI: | $3,700.00 US | BI: | $5,000.00 US |
| 2. PD: | $1,800.00 US | PD: | $1,800.00 US |
| 3. MP: | $ 750.00 US | | |

B. <u>Evaluation.</u> American Service Insurance Company's policy is to evaluate claims and suits based on probability rather than possibility. Predicting what a court or jury may award to a claimant is very difficult. Exceptional verdicts are highly publicized, yet less than 5% of our liability claims and suits result in verdicts. Claimants' attorneys normally recognize that verdicts vary significantly, even on cases that are quite similar, so the risks inherent at trial encourage compromise settlements. Although verdicts may, over time, influence the usual or average compromise settlement on a given type of claim in a given area, we owe it to the policyholders, who pay premiums, not to let a few high verdicts unduly influence our evaluations and payments on the overwhelming majority of claims and suits that are settled. This means that, while anything is possible in court, our starting point in evaluating a liability claim or suit is to determine the probable or estimated settlement value of the injury or property damage; i.e.. the usual or average settlement on like cases. The methodology to be used in evaluating and reserving liability claims and suits is a three-stage process of:

1. DETERMINE THE DAMAGE VALUE (DV). This is the probable settlement value of the claimant's injury or property damage, without regard to liability or comparative fault on the part of the claimant; or other parties; the usual settlement value. It is not representative of a high verdict, nor does it represent the highest or lowest settlement experienced on similar claims. When establishing or adjusting the *Damage Value* on bodily injury claims, consider the following components at a minimum:

   (a.) Extent of injury/damages;
   (b.) Medical expenses (diagnostic and therapeutic)
   (c.) Loss of income/other expenses
   (d.) Total amount of expenses (gross and out-of-pocket)
   (e.) Verified future expenses (medical and wage)
   (f.) Permanent or disfiguring injury
   (g.) Pain and suffering



(h.) Other intangible factors and influences which may increase or decrease the valued of a claim

(i.) Prejudgment interest, if applicable.

The claim handler should always estimate the *DV* through individual thought process, and/or round tabling. The amount of policy limits should not be considered at this point.

2. DETERMINE THE PERCENT OF LIABILITY ON THE PART OF THE INSURED (PL). This is our assessment of the insured's probable responsibility for the claimant's injury or property damage, our insured's responsibility compared to that of the claimant and all other culpable parties. It is the percentage of legal liability that we believe will be assessed against our insured after weighing the facts, considering the applicable laws, assessing the responsibility of others, and determining whether viable codefendants are financially capable of making a contribution or satisfying a potential judgment. You must consider whether joint and several liabilities apply.

3. ESTABLISH THE ESTIMATED SETTLEMENT VALUE (ESV). This is simply the *Damage Value* multiplied by the percent Liability on the insured's part. For example:

| | |
|---|---|
| $20,500 | Damage Value |
| X   .40 | %Liability on Insured's Part |
| $ 8,200 | Estimated Settlement Value |

The ESV should not exceed the policy limits. If so, it should be reduced. The ESV represents our most likely payment, our settlement objective in the final stages of negotiations. However, since no two cases are exactly alike and, in most cases, there is an adversary relationship, give and take will occur. Thus, our settlement objective, in the early stages of negotiation, is often something less than the reserve on any given case. Each and every claim has a certain lifespan. Early in the life of some claims, reserves are often based on incomplete information and represent only a best "guess". As the claim ages and as better information is developed, our evaluation must change and our reserves must therefore change. Once the evidence is known, and the claim has been fully evaluated based on that evidence, we should be willing to negotiate a compromise settlement up to the established *Estimated Settlement Value*, which generally should be the top figure of our range of settlement goals. Some exceptions arise; e.g. a claimant's contributory negligence in some jurisdictions may be such as to bar recovery; the facts and the law may be so heavily in the insured's favor that we would refuse to make a compromise settlement even though we carry a reserve. Any exception to our normal willingness to negotiate a compromise settlement up to the *ESV* requires an appropriate rationale and explanation in the claim file.

C. <u>Reserving.</u> Based on the foregoing process to evaluate a claim, a reserve should normally represent the probable cost of what we expect to pay on any claim. It is not the best-case or worst-case scenario figure. Our goal is to establish a firm reserve as soon as possible dependent on the type of claim and ability to obtain adequate facts, for example:

1. Simple claims: First or third party physical damage claims should take 30 days or less as a reasonable time period.

41



2. Complex or serious claims and first notice suits: may take 30-90 days.
3. Liability issues in most nonsuit claims can be resolved within 30-45 days.
4. Coverage issues should be finalized or a position established within 30 days.

In any case, from the time of receipt of a claim or suit until conclusion the reserve must be based on all available information, even if it represents our best "guess". The reserve should be updated as new information or developments occur. Intentional "stair stepping" should be avoided in most instances.

D. Minimum Reserving Factors: We are obligated to maintain overall reserving integrity on our entire book of claims. This means that we must recognize the fact that some "no liability" or "no coverage" cases are ultimately lost. Even when the law and/or the evidence are heavily in favor of our insured, we can still expect plaintiff verdicts infrequently in "no liability" or "no coverage" cases. To maintain reserving integrity on our entire book of claims, we expect to reserve a minimum of 10% of the *Damage Value* on all claims, even on cases where our investigation determines our insured has no liability. Adopting this approach should result in adequate aggregate reserves on our book of "no liability" and "no coverage" claims so that we can accommodate every claim. For example: Our insured is T-boned by the claimant driver. Liability is 100% versus the claimant. The claimant car is a total loss with a **DV** of $20,000 (acv + rental). The claimant's injury is worth $50,000 DV. The reserves in this case would be $2000 APD and $5000 ABI. All First party losses should be reserved initially at the agreed upon factor reserve unless initial information received reveals a reason for an immediate increase or decrease. UMBI claims would be handled the same as third party liability claims.

E. First Notice Suits. Frequently, service of suit papers is our first notice of a claim. Therefore, it is difficult to establish a representative reserve when transmitting the claim. If the information is lacking, make a best "guess". Avoid setting an arbitrary reserve of $1.00 or some other preset amount. Consider the limited information and utilize good claim judgment to make the best "guess". This reserve should be reexamined within 45 days and adjusted to an appropriate level. Manager shall notify Company of first notice suits by means of a monthly active suit report.

F. Changes in Reserves. A reserve change should be made within 10 days whenever new information or a change in a prior evaluation will result in an adjustment of $1,000 or more. In instances where receipt of closing papers will be delayed (awaiting court approval, the finalization of a Structured Settlement, or final billing from defense counsel), adjust the reserves to the amount of settlement within 10 days unless the difference is less than $1,000.

## ARTICLE IV.    Claims Service Fees.

A. For all claims services to be rendered by the Manager during the term of this Agreement the Company shall pay the Manager a fee of 7% of the Premium Earned and buy out fees relating to that premium. This fee shall be deemed to cover all of Manager's defense and cost containment expenses (DCC) excluding legal expenses allocated, and of adjusting and other expense (AOE) (unallocated loss adjustment expenses), including unallocated legal and investigative expenses, and no additional or supplementary fee shall be payable to Manager for claims services. The fee shall be paid at the rate of 2% of premium earned for DCC and 5% of premium earned for AOE.

42




B.  The Company shall pay Manager 90% of the claim fee due following Company's receipt of an invoice and the monthly bordereau supporting such fee. Such claims fee shall be paid within ten (10) days of Company's receipt of the invoice.

C.  So long as Manager performs in accordance with all claims handling obligations under this Agreement, ten percent (10%) of the fee shall be deposited in an escrow account ("Claims Escrow") by the Company to handle claims should the Program go into a run off situation.  Conditional upon performance by the Manager of all claim services in accordance with the requirements set forth herein and any other written instructions of the Company and delivery of notice to the escrow agent of the completion of such performance by the Company, funds from the Claims Escrow shall be distributed to the Manager on a  calendar year basis and no sooner than 12 months after end of the calendar year and only after agreement between the Company and the Manager that all claims handling obligations have been fulfilled.

Funds from the Claims Escrow shall be distributed to Company by the escrow agent to the extent the Company has damages or expenses due to Manager's failure to perform all or part of its obligations with respect to servicing the run-off Business.  Any funds held in the Claims Escrow shall constitute property of Company and shall not constitute property of the Manager unless and until such time as any and all other contingencies have been fully removed and satisfied.

## ARTICLE V.   Termination.

A.  The claims settlement authority granted to Manager pursuant to this Endorsement C may be terminated by the Company for cause, or at the Company's sole discretion upon written notice to the Manager or upon the termination of this Agreement.  The Company may suspend the Manager's settlement authority during the pendency of any dispute, or arbitration proceeding regarding the cause for termination.

B.  Manager shall still be responsible to manage claims attributable to Business written under this Agreement even after the termination of this Agreement. However, Company shall have the right, but not the obligation, to direct the manager in the administration of, or assume administration of any claim or all claims at any time. In such case, Manager shall fully cooperate with Company and Company shall have access to all claim files, electronic data, systems and Manager's facilities for purposes of administering the claims, and Manager shall deliver any or all original and electronic claims files to Company promptly upon request.

C.  The payment of fees, except for funds from the Claims Escrow, will cease on the effective day of termination of this Agreement or termination of Manager's claims handling authority hereunder notwithstanding Manager's continued handling of runoff claims. To the extent Company directly handles administration of the claims attributable to the Business, Manager's fee shall be proportionately reduced or eliminated as determined in Company's sole discretion.

43



**ENDORSEMENT D**
**PROGRAM MANAGER AGREEMENT**
**COMMISSION PAYMENTS**

**ARTICLE I.   Commission.**

As compensation for the business covered by this Agreement and for the faithful performance of Manager's duties to process, register and report program Business to Company under this Agreement, Company agrees to pay Manager a commission on net written premium which Manager submits to Company and which Company underwrites.

As used in this Endorsement D, the following terms shall have the described meanings:

A.  "Net Written Premium" shall mean the gross premiums (excluding policy fees) charged on all original and renewal Policies written on behalf of the Company, less return premiums.

B.  "Premiums Earned" shall mean unearned net premiums at the beginning of the year; Plus Gross Written Premiums, less return premiums (GWP) during the year; less unearned net premiums at the end of the year.

C.  "Net Policy Fees" shall mean gross policy fees, if any, charged on all original and renewal Policies written on behalf of the Company, less return policy fees.

D.  "Accident Year (Agreement Year) Losses Incurred" shall mean:  losses outstanding for the accident year at the end of the year, plus losses paid for the accident year, less accident year recoveries, plus accident year loss adjustment expense and legal fees paid and outstanding, plus fees paid under any Claims Service Agreement, plus IBNR reserve at the end of the year, plus all assessments and regulatory required contributions.

E.  Not applicable.

F.  "Loss Ratio" shall be determined by dividing the Accident Year Losses Incurred for the year by the  Premiums Earned for the year.

**ARTICLE II.  Commission Payments**

A.  Provisional Commission.   The Company shall allow the Manager a provisional commission of 18.0% on all premiums written on behalf of the Company hereunder, plus 70% of all policy and of all service fees collected on policies covered by this agreement. The Manager shall allow the Company return commission on return premiums at the same rate.  This is an obligation owing directly from the Company to the Manager. The Manager shall not seek to recover from the Company any commissions due.  No funds are due the Manager from the Company.

B.  Escrow Account.  The Manager shall establish an initial Escrow Account providing security via a Letter of Credit or funds withheld in an amount equal to or greater than the

44



escrow calculated at the provisional commission rate less the minimum commission rate times 100 percent times the estimated earned premium. The contributions establishing the Escrow Account shall be agreed to between the Manager and the Company and shall be specified in Endorsement F. The Manager agrees to increase the Escrow Account as necessary.

C. "Contingent Profit Commission for each accident year" shall be calculated as follows:

1.  If the Loss Ratio is greater than, or equal to, 75.0%, the Manager's commission shall be at the minimum rate of 13.0%. The Manager shall escrow and provide security via a Letter of Credit for an amount to be agreed upon by Manager and Company that would anticipate the difference between the Provisional Commission and the minimum commission rate should the Loss Ratio exceed 70.0%. Any downward adjustment that results in amounts due Company will be drawn from the escrow account.

2.  If the Loss Ratio is greater than, or equal to, 70.0%, but less than 75.0%, the Manager's commission shall be the Provisional Commission rate, less 100% of the difference between the loss ratio percent and 70.0% The Manager shall escrow and provide security via a Letter of Credit for an amount to be agreed upon by Manager and Company that would anticipate the difference between the Provisional Commission and actual commission rate should the Loss Ratio exceed 70.0%.

3.  If the Loss Ratio is greater than, or equal to, 68.0%, but less than 71.0%, the Manager's commission shall be the Provisional Commission rate.

4.  If the Loss Ratio is greater than, or equal to, 58.00%, but less than 68.0%, the Manager's commission shall be the Provisional Commission plus 50% of percentage by which the Loss Ratio is less than 68.0%.

5.  The Maximum commission rate shall be 23.0%.

6.  Attached to this Endorsement is a spreadsheet documenting the intention of these terms by means of a scenario assuming $15,000,000 of written premium (Exhibit 2). By the terms of this agreement the Manager is required to provide security as defined in Article II B item 1 above for the amount of return commission as demonstrated in Exhibit 2 attached.

D. The Company shall calculate and report the adjusted commission on premiums earned within 90 days after 60 months after the end of each agreement year, and within 60 days after the end of each 12-month period thereafter until all losses subject hereto have been fully settled. If the adjusted commission on premiums earned is less than commissions previously allowed by the Company on premiums earned for the agreement year, the Manager shall remit the difference to the Company immediately. If the adjusted commission on premiums earned is greater than commissions previously allowed by the Company on premiums earned for the agreement year, the Company shall remit the difference to the Manager as promptly as possible after receipt and verification of the Manager's report.

E. As respects the final adjustment period, the Company shall calculate and report the adjusted commission on premiums earned within ninety (90) days after the date of



termination, and within ninety (90) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such accident year calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Company on premiums earned for the same period, the Manager shall remit the difference to the Company with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Company on premiums earned for the same period, the Company shall remit the difference to the Manager as promptly as possible after receipt and verification of the Manager's report.

## ARTICLE III. Miscellaneous provisions

A. Manager shall refund on a prorated basis to Company, on all insurance issued under this agreement, commissions on coverage which has been canceled by Company or the insured, and on premiums which have been reduced or refunded, in each case at the same rate at which such commissions were originally payable and within the period of time required by the rules or regulations of Company.

B. Manager's fees and commissions and any other monies due Manager shall be subject to offset by Company, or any of its affiliates for any money due from Manager to Company or its affiliates.  This provision shall not be affected by the insolvency of the Manager.

C. Upon breach by the Manager of any financial obligation to Company, Company shall have the right to collect any outstanding indebtedness directly from any insured, agent, broker, sub-producer or other party owing any sum to Manager for program business. If Company exercises such right by collecting such indebtedness directly, Company shall be accountable to Manager for any sum received which, net of expenses associated with such collection, exceeds the amount owed to Company by Manager.




**ENDORSEMENT E**
**PROGRAM MANAGER AGREEMENT**
**FINANCIAL PROTOCOLS**

**ARTICLE I.    Wire transfer.**

A.  Premium funds other than those detailed in the Premium Trust Fund requirements detailed in the Agreement, Article III, Paragraph N are to be transferred to Company into the below bank and account.

    1.  Depository Name: American Service Insurance Company Premium Fund Trust Account – La Salle Bank, N.A.
    2.  ABA #: 071000505
    3.  Account Number: 2153492

B.  Provide the following reconciliation information, preferably by e-mail, to Company's MGA Accountant concurrently with the actual wire transfer:

    1.  a confirmation of wire transfer detailing funds and date of wire;
    2.  a cash remittance report that details what is included in the monthly wire;
    3.  if reporting to Company through our AS 400, a copy of the account current detailing the cash remittance(s).

C.  Please direct any inquiries to Company's MGA Accountant.

**ARTICLE II.    Financial reporting protocol.**

A.  Premiums, losses, etc. are to be reported to Company per the protocol detailed in the Agreement.  The monthly financial report should follow the prescribed format and frequency.

B.  Please direct any inquiries to Company's MGA Accountant at Company.

**ARTICLE III.    Collateral**

A.  Collateral uses.  Collateral should be collected as:

    1.  Security for a self-insured retention ("SIR").  The amount of collateral required in this instance is at least 110% of outstanding loss reserves within the insured's self-insured retention PLUS the Company's exposure on miscellaneous bonds issued for the Insured, if any.
    2.  Security for premium payments.
    3.  Security for unusually large deductibles.

B.  Collateral forms.

    1.  The method of collateralization if an irrevocable letter of credit issued by an FDIC insured U.S. bank naming American Service Insurance Company, Elk Grove Village,

47




            IL as beneficiary.  Only the Company's approved letter of credit wording may be used.

2. A cash deposit may be used with written permission of the Company.  Securitization via cash should not be a common occurrence.

3. In no event is the manager authorized to accept any other forms of collateral on the Company's behalf.

C. Collateral management.

1. Original copies of letters of credit are to be provided to the Company (attention: Collateral department).

2. Cash deposits are to be held in a joint trust account established in advance.  Deposits to the joint trust account by both the Company and the Manager.  Withdrawals may be made by the Company only.

## ARTICLE IV. Pass Through Fees

A. Manager shall be responsible for all regulatory fees collected on a per policy basis as mandated by any regulatory agency in assigned territories.

B. All fees shall be accounted for on a monthly report to the Company.

C. All such fees shall be sent to the appropriate regulatory agency in the time frame mandated by statute or regulation.



## ENDORSEMENT F
## PROGRAM MANAGER AGREEMENT
## MANAGER'S PERSONAL GUARANTY

**WHEREAS,** Ramon Villareal, individually, with a residence at 3206 N. Bryan, Mission, TX, is an officer of a Managing General Agency desirous of entering into a Program Manager Agreement, and acting as a Managing General Agent for American Service Insurance Company;

**WHEREAS,** to induce ASI to enter into said MGA Agreement, Ramon Villareal (and Spouse if desired) (hereinafter referred to as "Guarantor") has/have agreed to guarantee the faithful performance of all the terms and conditions of the Program Manager Agreement (hereinafter "Agreement");

**NOW THEREFORE,** to induce ASI to enter into the Agreement, a copy of which is attached hereto and incorporated herein as if fully set forth, the undersigned for good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, and with intent to be legally and personally bound does hereby agree:

1.    The recitals heretofore set forth are incorporated herein as if fully set forth.

2.    The Guarantor absolutely, unconditionally and irrevocably guarantees to ASI, and the successors and assigns to ASI, the full, complete and punctual performance and observance by the name all MGA participating operating subsidiaries here (hereinafter "Managing General Agent") of all terms, covenants and conditions contained in the Agreement on the Managing General Agents part to be kept, performed or observed. This guaranty shall include any liability of the Managing General Agent which shall accrue under the Agreement for any period preceding as well as any period following the term in the Agreement specified, to specifically include any "run-off period". The Guarantor waives notice of any breach or default by the Managing General Agent. If, at any time, default shall be made by the Managing General Agent in the performance or observance of any terms, covenants or conditions in the Agreement related to the collection and payment of premiums on business written by the Managing General Agent, ASI shall have all rights and other remedies available at law and equity against the Guarantor personally and individually for all amounts due hereunder with interest, costs and attorney's fees using this Guaranty or a copy hereof as authority for such action. **Default as used in this section shall mean, but is not limited to, failure to perform any of the terms or obligations under this agreement, failure to collect and post to the specified ASI account any premium collected on ASI business, any malfeasance, misfeasance, or nonfeasance, or gross negligence in relation to any term of this agreement.**

3.    Any act of the Managing General Agent, or ASI or the successors and/or assigns of ASI constituting a waiver of any of the terms or conditions of the Agreement, or the giving of any consent to any matter or thing relating to the Agreement, or the granting of any indulgences or extensions of time to the Managing General Agent, may be done without notice to the Guarantor and without releasing the obligations of the Guarantor hereunder.




4.    The obligations of the Guarantor hereunder shall not be released by ASI's receipt, application, or release of security given, if any, for the performance and observance of the covenants and conditions in the Agreement; nor by any modification of the Agreement, but in case of any such modification the liability of the Guarantor shall be deemed modified with the terms of any such modification of the Agreement. The Guarantor shall not assign this Guaranty. The Guarantor agrees to waive any right to assign this Guaranty and any assignment shall be void *ab initio*. It shall be a default offense under the Agreement if Guarantor assigns, or attempts to assign, this Guaranty.

5.    The liability of the Guarantor hereunder shall in no way be affected by (a) the release or discharge of the Managing General Agent in any creditors', receivership, bankruptcy or other proceedings; (b) the impairment, limitation or modification of the liability of the Managing General Agent or the estate of the Managing General Agent in bankruptcy, or of any remedy for the enforcement of the Managing General Agent's liability under the Agreement, resulting from the operation of any present or future provision of the applicable Federal or State Bankruptcy Act; (c) the rejection or disaffirmance of the Agreement in any such proceedings; (d) the assignment or transfer of the Agreement by the Managing General Agent; (e) any disability or other defense of the Managing General Agent; or (f) the cessation from any cause whatsoever of the liability of the Managing General Agent.

6.    Until all the covenants and conditions in the Agreement on the Managing General Agent's part to be performed and observed are fully performed and observed the Guarantor waives any right of subrogation against the Managing General Agent.

7.    This Guaranty shall apply to the Agreement, any modification, extension or renewal thereof.

8.    This Guaranty may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the Guarantor and ASI.

9.    The Guarantor shall post security in the total amount of $500,000 in the form(s) specified below:

> An Irrevocable Letter of Credit with a financial institution acceptable to the Company per below schedule:
>
> July 1, 2006-        $125,000
> October 1, 2006-     $125,000
> January 1, 2006      $125,000
> April 1, 2006        $125,000

10.    In the event of default on the financial obligations required by the Agreement, the Guarantor shall receive an offset to monies owed the Company equal to the amount of money Company receives from Guarantor's required security.

11.    The undersigned represent(s) and warrant(s) that after consultation with counsel he/she/they is/are knowingly and willingly executing and delivering this document with the intent to be personally bound, that this Guaranty is executed contemporaneously with the Agreement, and that he/she/they is/are authorized to execute this Guaranty.




IN WITNESS WHEREOF, the undersigned have set their hands as of this _____ day of _____ 20_

Signed sealed and delivered in the
presence of:

_____
Ramon Villareal
Witness
  Individually


_____
Name of Spouse (if used)
Witness
  Individually

_____
Daniel Hernandez
Witness
  Individually

Exhibit 2

Minimum Provisional 18%
LR defined as Accident Year Losses Incurred + LAE (ALAE + ULAE)
Profit Share add'l 0.50% from 67% to 58%.
Loss Corridor 1.0% reduction @ 71% to 75%.
Authorized on 06/28/06

| | | | | | | Projected LR | | | * Projected LR a | |
|---|---|---|---|---|---|---|---|---|---|---|
| Loss J Pick = Pure Loss | 67.00% | 66.00% | 65.00% | 64.00% | 63.00% | 62.00% | 61.00% | 60.00% | 59.00% | 58.00% |
| LAE & ULAE | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% |
| Total Losses + LAE | 75.00% | 74.00% | 73.00% | 72.00% | 71.00% | 70.00% | 69.00% | 68.00% | 67.00% | 6... |
| Min Prov Commission | 18.00% | 18.00% | 18.00% | 18.00% | 18.00% | 18.00% | 18.00% | 18.00% | 18.00% | 1... |
| | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0... |
| Net Commission | 13.00% | 14.00% | 15.00% | 16.00% | 17.00% | 18.00% | 18.00% | 18.00% | 18.50% | 1... |
| BB&T | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0... |
| Brokerage | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0... |
| Admin Fee | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4.00% | 4... |
| CCR | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 92.00% | 91.00% | 90.00% | 89.50% | 8... |
| Profit Margin | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 9.00% | 10.00% | 10.50% | 1... |
| Fee Income @ % | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 9.00% | 10.00% | 10.50% | 1... |
| Gross Profit | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 8.00% | 9.00% | 10.00% | 10.50% | 1... |

**ENDORSEMENT G**
**PROGRAM MANAGER AGREEMENT**
**AMENDMENT TO VARIOUS TERMS AND CONDITIONS**

1.  ARTICLE III, paragraph Y.1. is deleted in its entirety and replaced as follows:

ARTICLE III.

\* \* \* \* \* \*

Y.  <u>Financial Statements.</u>

1.  To furnish the Company with an audited financial statement prepared by an independent certified public accountant for the most current year ended December 31, no later than ninety (90) days after the execution hereof, or the Company may, at its option, render this Agreement void ab initio. Thereafter, the Manager shall furnish the Company, on an annual basis, an audited financial statement prepared by an independent certified public accountant, as of December 31 of each calendar year, in a form acceptable to the Company, no later than March 31 of each year. In addition, quarterly estimates will be supplied to the Company by the Manager. The Company shall rely on all financial statements provided by Manager in commencing and continuing the relationship established by this Agreement.

2.  ARTICLE II, paragraph E of <u>ENDORSEMENT D</u> is deleted in its entirety and replaced as follows:

ARTICLE II.

\* \* \* \* \* \*

E.  As respects the final adjustment period, the Company shall calculate and report the adjusted commission on premiums earned within ninety (90) days after the date of termination, and within ninety (90) days after the end of each twelve (12) month period thereafter until all losses subject hereto have been finally settled. Each such accident year calculation shall be based on cumulative transactions hereunder from the beginning of the final adjustment period through the date of adjustment, including, as respects losses incurred, any debit or credit from the preceding adjustment period. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is less than commissions previously allowed by the Company on premiums earned for the same period, the Manager shall remit the difference to the Company with its report. If the adjusted commission on premiums earned for the final adjustment period as of the date of adjustment is greater than commissions previously allowed by the Company on premiums earned for the same period, the Company shall remit the difference to the Manager as promptly as possible after receipt and verification of the Manager's report, and a sixty (60) month period has lapsed.

3.  The following section is added to ARTICLE III, paragraph BB:

ARTICLE III.

\* \* \* \* \* \*

BB.  Prohibited Actions. The Manager shall have no authority to:

\* \* \* \* \* \* \*

8. Permit any sub-producer to serve on its Board of Directors.

4.  ARTICLE XX, paragraph O is deleted in its entirety and replaced as follows:

ARTICLE XX.

\* \* \* \* \* \*

O.  Survival. Articles XII, XIV, XV B, XVI, XVII, XVIII, XIX, XX, Articles IV. B., Article V of Endorsement C, Endorsement D. Article II, paragraph E, Endorsement F and any other provisions of this Agreement not herein specified which address the conduct of the parties post-termination shall survive termination of this Agreement.

5.  ARTICLE I of **ENDORSEMENT A** shall be amended to include UNDERWRITERS MGA, INC., ALMEX SEGUROS, S.A. de C.V., and ASESORES de RIESGOS INTERNACIONALES DE MEXICO, S.A. de C.V. (ARIMEX), in addition to NAFTA GENERAL AGENCY, INC., as entities authorized to conduct business under this Program Manager Agreement.

6.  ARTICLE I of **ENDORSEMENT A** shall be amended to include ENDORSEMENT G as a Governing Endorsement.

7.  Paragraph 2 of **ENDORSEMENT F** shall be amended to include UNDERWRITERS MGA, INC., ALMEX SEGUROS, S.A. de C.V., and ASESORES de RIESGOS INTERNACIONALES DE MEXICO, S.A. de C.V. (ARIMEX), together with NAFTA GENERAL AGENCY, INC., individually and collectively, in the definition of "Managing General Agent."

8.  Paragraph 9 of **ENDORSEMENT F** shall be deleted in its entirety and replaced as follows:

This Guaranty shall be secured by an irrevocable, unconditional, evergreen Letter of Credit ("LOC") with a financial institution acceptable to ASI in a face amount of $250,000 on terms and conditions acceptable to ASI. In the event of a breach of this Guaranty or any breach by Managing General Agent (including any of its affiliates) of the Agreement or any Endorsement thereto, ASI shall be entitled to (1) draw upon such LOC, and (2) draw upon the Letter of Credit provided for pursuant to that certain Program Manager Agreement between ASI and UNDERWRITERS MGA INC. dated as of January 1, 2007, or any Endorsement thereto.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

**NAFTA GENERAL AGENCY and all entities listed in ENDORSEMENT A to this Agreement.**

By: _____

Title: DANICA HERNANDEZ/ DIRECTOR OF OPERATIONS

Date: 2/6/07

WITNESS: _____

Company:

**AMERICAN SERVICE INSURANCE CO.**

By: _____

Title: PRESIDENT & CEO

Date: 2/23/07

WITNESS: _____

**UNDERWRITERS MGA, INC.**

By: _____

Date: 2/ Feb./ 07

WITNESS: _____

**ALMEX SEGUROS, S.A. de C.V. (ALMEX)**

By: _____ Rosa Elena Cantú P.

Date: 02106107

WITNESS: _____

[Signature Page to Endorsement G of the Program Manager Agreement]

ASESORES de RIESGOS
INTERNACIONALES DE MEXICO, S.A. de C.V.
(ARIMEX)

By: _____ Roberto Antonio Terán

Date: 2/06/07

WITNESS: _____

**RAMON VILLAREAL**
Individually

By: _____

Date: 27 Feb. 07

WITNESS: _____

**SPOUSE**
Individually

Name: _____

By: _____

Date: _____


WITNESS: _____


[Signature Page to Endorsement G of the Program Manager Agreement]

4

ENDORSEMENT H
PROGRAM MANAGER AGREEMENT
AMENDMENT TO VARIOUS TERMS AND CONDITIONS

ARTICLE XX, Paragraph D is deleted in its entirety and is replaced as follows:
No Assignment. This contract may not be assigned in whole or part by the Managing General Agent.

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

**NAFTA GENERAL AGENCY and all Entities listed in ENDORSEMENT A to this Agreement.**

By: _____

Title: _DIRECTOR OF OPERATIONS_

Date: _6/12/07_

WITNESS: _____

**AMERICAN SERVICE INSURANCE CO.**

By: _Thomas R. Gorman_

Title: _President & CEO_

Date: _August 29, 2007_

WITNESS: _____

**UNDERWRITERS MGA, INC.**

By: _____

Title: _Pres._

Date: _14 Jun 07_

WITNESS: _____

**ALMEX SEGUROS, S.A. de C.V. (ALMEX)**

By: _____

Title: _DIRECTOR GENERAL_

Date: _12 Jun 07_

WITNESS: _____

[Signature page to Endorsement H of the Program Manager Agreement]

**ASESORES de RIESGOS**
**INTERNACIONALES DE MEXICO, S.A. de C.V.**

By: _____

Title: Representante Legal

Date: 06/12/2007 _____

WITNESS: _____


**ASESORES de RIESGOS**
**INTERNACIONALES, S.A. de C.V.**

By: _____

Title: Director de Operationes

Date: 6/12/2007 _____

WITNESS: _____


**RAMON VILLAREAL**
Individually

By: _____

Title: Presi

Date: 14/Jun./07.

WITNESS: _____


**ALEJANDRO VILLAREAL**
Individually

By: _____

Title: PRESIDENT

Date: 15/JUN/2007


[Signature page to Endorsement H of the Program Manager Agreement]